UNITED STATES of America, Plaintiff–Appellant,

v.

Hiroyasu TAKAI; Akiko Magneson, Defendants–Appellees.

No. 90–10157.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 14, 1991.

Decided April 19, 1991.

Rory K. Little, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellant.

Garrick S. Lew, Minami, Lew, Tamaki & Lee, San Francisco, Cal., for defendant-appellee Magneson.

Arlene West, West, Molesky & Brown, Oakland, Cal., for defendant-appellee Takai.

Before TANG, BOOCHEVER and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Hiroyasu Takai and Akiko Magneson pled guilty to the crimes of bribing an official of the Immigration and Naturalization Service in violation of 18 U.S.C. § 201(b)(1)(C) and of conspiring to bribe that official in violation of 18 U.S.C. § 371. They were sentenced to four months in home detention under an electronic program, to probation, and to fines of $15,000 apiece. The United States appeals the sentence. We affirm.

## FACTS

Akiko Magneson was born in 1947 in Yokohama, Japan. In 1971 she married Ronald Magneson. The Magnesons lived in Australia for 5 years and for 3 years in Venezuela. In 1979 they settled in Los Gatos, California. They have a daughter aged 14. In 1985 Magneson started her own business, Akai's Gems. She operates the business from her home and makes approximately $5,000 a year. She has also done research into the importation of clothes from Bangkok. Her husband works as a broker for a computer chip brokerage company.

Hiroyasu Takai was born in 1956 in Kashiwara–Cho, Japan. He is a graduate of Saint Andrew's University, Osaka. In 1978 he settled in San Jose, California where he developed a private language school in 1981 and an aviation school in 1988. He married Matsumi Matsumura on February 24, 1989.

In late February 1989 Magneson met James Goldman, an investigative agent of the Immigration and Naturalization Service, on a plane from Tokyo to San Francisco. They struck up a friendly relationship. Three weeks later Magneson called Goldman at his INS office in Washington and engaged in general conversation. A few days later, on April 5, 1989, Magneson again called Goldman at his office. Magneson brought up the need of a friend of hers, Hiroyasu Takai, to obtain a green card for his new wife who was a Japanese national. Goldman recorded the conversation.

In the course of this conversation and several other conversations recorded between April 5 and April 12, 1989, Magneson agreed to pay Goldman $15,000 to obtain green cards for three or four persons. These persons included Takai's wife; another friend of Magneson who was about to divorce her husband and on doing so would need a green card; and two students who were employees of Takai's pilot training school.

In the course of these negotiations Goldman also spoke by telephone with Takai, who at first agreed to the plan as far as his wife was concerned, but on April 12 told Goldman that he was "going to back out." Takai did so after consulting his lawyer who told him that the plan was illegal. Despite this advice Takai loaned $1,500 to one of his students for his part of the bribe and passed on the bribe money from both students to Magneson. She delivered half of the bribe, $7,500 in cash, to Goldman at

the Red Lion Hotel in San Jose and was immediately arrested.

## PROCEEDINGS

Takai and Magneson pleaded guilty to the charges of bribery and conspiracy to bribe. They accepted responsibility for their actions and expressed sorrow and shame. The base offense level for offering a bribe is ten, Sentencing Guidelines (U.S. S.G.) § 2C1.1(a). As the bribe was determined by the court to be $15,000, there was an increase of three to thirteen. *Id.* at § 2C1.1(b)(2)(A). The offense level was then adjusted down two levels because of their acceptance of responsibility. *Id.* at § 3E1.1(a). The defendants had no prior criminal conviction, so their criminal history score was zero. With an offense level of eleven the Sentencing Guidelines range was eight-fourteen months imprisonment. *Id.* at Ch. 5, Part A (sentencing table). As the range was above six months the Guidelines provided that half the minimum term should be imprisonment. *Id.* § 5C1.1(d). Each defendant had a different probation officer, neither of whom recommended departure in a way that would avoid imprisonment.

The defendants presented evidence in mitigation to induce the district court to depart downwards. After hearing the evidence and argument the district court stated that it was departing downwards by one point, so that imprisonment was not required. The defendants were sentenced to four months in home detention under the electronic monitoring program, were each sentenced to fines of $15,000, and were placed on probation for five years under the usual conditions.

On March 8, 1990 the district court entered an order "to explain the factors influencing its decision to depart downward." The court stated: "The defendants in this case did not seek or receive any pecuniary gain. The government has offered no evidence of any other benefit received. They were primarily motivated by a misguided desire to help three members of their immigrant community obtain green cards." The court continued: "The seriousness of de-fendants' participation is mitigated by the conduct of the government agent. While there was no allegation of entrapment, there was evidence at the sentencing hearing that Agent Goldman's conduct influenced defendants' decisions to continue playing a pivotal role.... The pattern of government conduct, the defendants' attempt to play a more limited role, and the absence of pecuniary gain by defendants create mitigating circumstances in a highly unusual bribery case."

After determining that the amount of the bribe was $15,000 for purposes of computing the sentence, the court went on to say that it had "considered other mitigating factors," and added: "There are at least two well-publicized instances where Mr. Takai has gone to great personal expense to assist victims of crime or earthquake.... A downward departure is justified because defendants' conduct constitutes 'single acts of aberrant behavior.'" The government appealed, contending that the downward departure from the Guidelines was unjustified.

## ANALYSIS

*The Government's Case.* The government argues broadly that the Sentencing Guidelines mandate a brief term of imprisonment for serious first offenses and notes that the Sentencing Commission had observed that, under the preceding sentencing practice, courts sentenced to probation "an inappropriately high percentage of offenders guilty of certain economic crimes ..." U.S.S.G. Ch. 1, Pt. A, § 4(d). The Commission then said specifically as to bribery that "current sentencing practices do not adequately reflect the seriousness of public corruption offenses." *Id.* at Ch. 3, Pt. C, intro. comment.

The government goes on to argue that the district court's grounds did not constitute "circumstances of a kind, or to degree, not adequately taken into consideration by the Sentencing Commission" as required by 18 U.S.C. § 3553(b). In particular, the government argues that the defendants gained "prestige within their immigrant community" and "operate[d] businesses in

that community, which were also likely to benefit, directly or indirectly" from the bribes. The government further argues that if the undercover conduct in this case is endorsed as a ground for departure, "it will be a ground for departure in virtually *every* undercover case" (italics in original). The government treats Takai's charitable expenditures as simply reflecting "community ties" and "socioeconomic status" that cannot be considered in departure decisions. U.S.S.G. 5H1.6 and 1.10. Finally, the government characterizes "single acts of aberrant behavior" as "so vague that if endorsed by this court here, it will become the departure reason that swallows every white-collar first-offense case."

*The Guidelines' Treatment of Departures.* The Commission begins with the statutory basis for departure as "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). The Commission goes on to say that it "intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. Ch. 1, Pt. A, § 4(b). Race, sex, national origin, creed, religion, socioeconomic status, and the defendant's physical condition are factors that a court cannot take into account. "With those specific exceptions, however, the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the Guidelines, that could constitute grounds for departure in an unusual case." *Id.* The reasons that the Commission has adopted this policy are two and are in tension with each other: "[I]t is difficult to prescribe a single set of Guidelines that encompass the vast range of human conduct potentially relevant to a sentencing decision," and the Commission believes that courts will not have reason to depart "very often." *Id.* As sponsors of the Guidelines, the Commissioners are re-

luctant to believe that they have not anticipated most patterns of behavior. As students of human nature, the Commissioners recognize that the range of human conduct is very large.

■ *The Standard of Review.* We determine de novo whether the district court identified the mitigating circumstance and review under a clearly erroneous standard whether this circumstance actually existed. We review de novo whether the circumstance was adequately considered by the Sentencing Commission. We review for an abuse of discretion whether the circumstance should result in departure and whether the extent of departure was unreasonable. *United States v. Todd,* 909 F.2d 395 (9th Cir.1990); *United States v. Montenegro–Rojo,* 908 F.2d 425 (9th Cir.1990).

*The Identified Circumstances and Their Existence.* The district court's order of March 8, 1990 clearly identified the factors that led it to depart downward. A factual predicate exists for the particular factors listed by the court—that is, although the transcripts of the typed conversations are susceptible of different readings, as a reviewing court we cannot say the district court was clearly erroneous in finding that the defendants did not seek pecuniary gain and that there was no evidence of any other benefit; in finding that the government agent's conduct influenced defendants in the direction of not withdrawing from the plan; in finding that Takai had gone to great personal expense to assist crime and earthquake victims; and in finding that the defendants' conduct constituted single acts of aberrant behavior. The government indeed has challenged only the findings of no benefit and of aberrant behavior. We are not persuaded by its arguments.

■ Many bribery schemes offer no pecuniary benefit to the briber, but they almost always involve some other kind of benefit. *Noonan on Bribes,* xxii (1984). ("Bribers have included every variety of business, from very small to multinational; all the professions; every manner of criminal defendant; and the ordinary citizen in

line for an inheritance or in need of a traffic ticket being fixed.") So here, if Takai actually attempted to obtain a green card for his wife, he would have had a benefit, although not a pecuniary one; or if it had been proved that Magneson's status in the community would have risen because she was known as a fixer of green cards, she might have had a benefit. Or if it had been shown that her retailing of opals or his training of pilots would have boomed if the defendants were known to have a way with green cards, Magneson and Takai would have benefits. But nothing of this sort was proved.

As to whether Takai and Magneson's acts could be characterized as "single acts of aberrant behavior," if one lays stress on the phrase "single act" it appears that each fails the test because each obviously performed a whole series of acts leading up to the final act of delivering the cash to Goldman. On the other hand, it is fair to read "single act" to refer to the particular action that is criminal, even though a whole series of acts lead up to the commission of the crime. In this case there are two crimes—the forming of the conspiracy and the offer of the money. The conspiracy and the offer are so closely related that for the purposes of deciding whether they were aberrant they constitute a single act.

The government argues that any first offender could make the argument made by the defendants, because anyone who has never been caught before can claim that his first criminal slip was aberrational. We agree with the government that absence of prior convictions is not enough to show that the act in question was single and aberrant. *See United States v. Carey*, 895 F.2d 318, 324–25 (7th Cir.1990). But there is more than absence of prior convictions here. Takai actually consulted a lawyer and withdrew from the scheme so far as he would get any personal benefit. His continued involvement by loaning part of the bribe money and transmitting the cash collected was irrational: he knew the act was illegal so he should not continue for his own benefit, yet some-

how he convinced himself that his continued limited involvement was not criminal. This self-contradictory position makes no sense and is rightly viewed as an aberration.

Magneson was a 42–year–old housewife with a very small business, scarcely more than a hobby, involving the purchase of opals. Nothing in her background or experience indicates that she was in touch with the kind of smugglers of human beings who might trade in green cards. Everything points to the conclusion of the district court that she stumbled into something, awkwardly, naively, and with insufficient reflection on the seriousness of the crime she was proposing. For eight days she embarked on a covert course that was deeply injurious to good government and subversive of the law of this country. Her action was aberrant.

*The Consideration of the Circumstances by the Commission.* No indication exists that the Sentencing Guidelines Commission considered the case where the bribers obtained neither pecuniary nor any other benefit from their bribes. The Commission assumes that a briber will have "personal gain" in view. *See* U.S.S.G. § 2C1.1 comment. (back'g). No indication exists that the Sentencing Guidelines Commission considered the case where the conduct of the government agent induced persons, not known to be involved in any criminal activity, to refrain from withdrawing from a scheme of bribery. No indication exists that the Sentencing Guidelines Commission considered the case of a defendant who had performed outstanding acts of benevolence. The Commission itself treats aberrant behavior as something it has not considered. *Id.* at Ch. 1, Pt. A, Intro. § (4)(d).

*The Discretionary Departure.* Was there any abuse of discretion in considering any of these factors as a ground for any of these departures? As just noted, the Commission itself sees a single aberrant act as a ground for departure. The other grounds require more examination.

■ In the case of the crime of transportation for the purposes of prostitution or prohibited sexual conduct, 8 U.S.C. § 1328 and 18 U.S.C. §§ 2421, 2422, the Guidelines provide that where the defendant did not commit the offense for profit and the offense did not involve coercion, there should be a downward departure of eight. U.S. S.G. 2G1.1, comment. (n. 1). The Commission's introductory section on "Departures" expressly cites this instance as the Commission discusses departure by analogy. *Id.* at Ch. 1, Pt. A, § 4(b). Historically, an analogy has often been made between bribery and prostitution—the use of money to compromise what should be integrity is common to both cases, *see Noonan on Bribes* xviii (1984). It is accordingly appropriate to find an analogy here with the federal statutes involving prostitution and conclude that where the bribe was not for profit, a downward departure would be warranted.

■ Goldman's conduct did not constitute entrapment in a legal sense, nor was it of a character that could be labeled outrageous and so offered as a legal defense. Nonetheless, as the district court found, Goldman's conduct influenced Magneson and Takai to continue on their criminal course. "Imperfect entrapment"—i.e., a government informant talking a defendant into a crime the defendant is disposed to commit—is not a mitigating factor. *United States v. Dickey*, 924 F.2d 836 (9th Cir.1991). The present case is different in two aspects: the person who solicited the acts was a government official whom the defendants had every reason to believe was aware of the law; he was not an undercover agent or other informant whose government status was not visible to the defendants. And the defendants themselves were "innocents." The conduct of the government official must be assessed not abstractly in the air but in conjunction with the persons on whom the conduct has an impact.

Goldman adopted toward two persons hitherto innocent of any criminal activity or known criminal association or propensities what the government calls "his investiga-tive mode," making no distinction between these two persons who by happenstance had seen a sudden opportunity to acquire green cards illegally and persons engaged in organized crime as a matter of routine. The justification for lying by a government agent to the latter kind of person may be that such a person has, in effect, declared war on society and the rules of warfare, permitting deception, apply. This case is not the usual undercover case. Magneson and Takai were not at war with society. To lie to them, to deceive them, to conceal from them that their conversations were being taped and to fail to discourage them from their proposed crime were actions with an impact upon their conduct that are properly considered as mitigating. *Cf. United States v. Chen*, 754 F.2d 817, 825–26 (9th Cir.1985) (Tang, J., concurring).

■ As for Takai's acts of benevolence, they are not a necessary consequence of socio-economic status or community ties. The government conceded at oral argument that if Mother Teresa were accused of illegally attempting to buy a green card for one of her sisters, it would be proper for a court to consider her saintly deeds in mitigation of her sentence. With the principle established, it is only a matter of degree, and it seems entirely appropriate for outstanding good deeds by Takai to be considered as a relevant factor in determining whether there are mitigating circumstances.

■ *An Alternative Basis for Affirmance.* To this point we have looked at each of the factors enumerated by the district court separately and found them acceptable. But we may affirm on the basis of the record on the distinct and alternative ground that it is the convergence of all the factors that the court enumerated that constitutes the circumstance that led to its decision. The district court itself combined three factors when it found mitigation appropriate in what the court called "a highly unusual bribery case."

■ The statute speaks in the singular of "mitigating circumstance," 18 U.S.C. § 3553(b). There is no reason to be so literal-minded as to hold that a combination

of factors cannot together constitute a "mitigating circumstance." Given the Sentencing Commission's acknowledgment of "the vast range of human conduct" not encompassed by the Guidelines, a unique combination of factors may constitute the "circumstance" that mitigates. This conclusion is, indeed, required by the Guidelines themselves. The Commission says, in its formal treatment of departures, that the departure is to occur when "a court finds an atypical case," one "where conduct significantly differs from the norm." U.S. S.G. Ch. 1, Pt. A, § 4(b). What the Commission has focused on is "the case" conduct. Neither case nor conduct can be reduced to a single factor. Case and conduct are a total pattern of behavior.

In making a decision in any particular case, good judgment will often require the evaluation of a complex of factors. No single factor may be enough to point to the wise course of decision. But a wise person will not look on each particular factor abstractly and alone. Rather, it will be how the particular pieces fit together, converge, and influence each other that will lead to the correct decision. So here, the five factors specifically found by the district court converge to constitute a unique mitigating circumstance.

*Conclusion.* The district court did not abuse its discretion in weighing each and all of the factors proved to the court and not considered by the Sentencing Guidelines Commission in reaching a decision to depart downward by one point, so that imprisonment was not imposed upon the defendants. The sentence actually imposed was salutary and sharp, involving substantial fines, a period of confinement at home and a substantial period of probation—a sentence based on reason as required by 18 U.S.C. § 3553(c).

AFFIRMED.