UNITED STATES of America, Plaintiff–Appellee,

v.

Hoa Cam LAM, Defendant–Appellant.

No. 92–50321.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 7, 1994.

Decided March 31, 1994.

David M. Dudley, Los Angeles, CA, for defendant-appellant.

Steven G. Larson, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: PREGERSON, O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

Hoa Cam Lam pled guilty to the offense of being in possession of an unregistered sawed-off shotgun. 26 U.S.C. § 5861(d). He was sentenced in a proceeding where the district judge said that he would depart if he could but lacked the discretion to do so. Lam appealed and we now vacate the sentence and remand.

## BACKGROUND

Lam is the oldest son of a Vietnamese family that, amid great travail and sorrow, immigrated to this country in 1980 in an attempt to make a new life. He and the family arrived here penniless, but they are very close and they worked together and saved until they were able to open a small business. One evening, three masked men came into the business' warehouse. They robbed Lam and his pregnant sister at gun-point, fired shots, and, after going through drawers and cabinets, made off with personal jewelry that he was forced to give them. Lam, who was very frightened for himself and for his family, believed that as the oldest son the protection of the family was his responsibility.

He then had the misfortune of mentioning the robbery to a friend, who told him that he should keep a gun on the premises for protection, as other Los Angeles area businessmen did. Lam was convinced, despite family opposition to his having a weapon. The friend happened to have a gun to sell, and Lam, therefore, acquired a shotgun. As it turned out, that shotgun was sawed off; it had a barrel length of 16.5 inches, which brought it within the requirement that a shotgun with a barrel length of less than 18 inches must be registered. The gun was wrapped in a towel and hidden in the back of the warehouse.

In August of 1990, a United States Deputy Marshall came to the warehouse to effect a seizure of some bottles of fish sauce which had infringing trademarks upon them. As a routine matter, the marshall asked if there were any weapons on the premises. The answer was "yes," and the hidden weapon was produced. It was thereupon seized. This prosecution ultimately ensued.

Lam explained that he did not know that the weapon was sawed off, had no idea that it was illegal for him to have it, and would never go near guns again. The district court accepted all of those explanations.

The court then applied United States Sentencing Commission, *Guidelines Manual*, § 2K2.1(a)[1] which resulted in an offense level of 14, once two points were deducted for acceptance of responsibility. Lam had a Criminal History score of 3 because he had driven without a license, he had been given a one year probation term, and this offense had taken place within that one-year period. The result was a sentencing range of 18 to 24 months. The district judge sentenced Lam to 18 months but expressed disquiet with the severity of that sentence and allowed that he would go lower if he could. He spoke of his

---

1. All references are to the November 1, 1989, Guidelines.

distress at what he saw as the harsh and absolute unfairness of the Guidelines as they were being applied in this case, but he felt that his hands were tied. Lam appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to hear this appeal pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

■ The district court's interpretation of the Guidelines is a question of a law which we review de novo. *See United States v. Gavilan,* 966 F.2d 530, 531 (9th Cir.1992).

■ We review "de novo the district court's ruling that a particular circumstance does not constitute a permissible basis for departure and for clear error its finding that the mitigating circumstance does not exist in a particular case." *United States v. Morales,* 972 F.2d 1007, 1010 (9th Cir.1992), *cert. denied,* ⸺ U.S. ⸺, 113 S.Ct. 1665, 123 L.Ed.2d 283 (1993). We do "not have jurisdiction to review a district court's discretionary decision not to depart from the Sentencing Guidelines." *Id.* at 1011. However, if the district court believed that it did not have legal authority to depart, that decision is reviewable, unless the court indicated that it would not depart if it could. *Id.; United States v. Brown,* 985 F.2d 478, 480–81 (9th Cir.1993).

## DISCUSSION

Lam makes two arguments on appeal. He first asserts that U.S.S.G. § 2K2.1(b), which reduces the offense level to 6, cannot be limited to lawful use for sporting or collection purposes. He next asserts that the district court should have departed in all events. We consider each of these claims in turn.

### A. *Validity of the Guideline.*

The statute under which Lam was convicted was enacted as part of the Gun Control Act of 1968 ("Act"), Pub.L. No. 90–618, 82 Stat. 1213 (1968). Title I of the Act, codified at 18 U.S.C. §§ 921–928, generally concerns the transportation and sale of firearms and the licensing of manufacturers, dealers, im-

porters, and collectors of firearms. It also prohibits certain individuals from holding firearms. In Title I, the term "firearm" is broadly defined to include any weapon or destructive device. 18 U.S.C. § 921(a)(3). Title I includes a statement of Congress' purpose:

> The Congress hereby declares that the purpose of this title is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence, and it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap-shooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, . . . .

Pub.L. No. 90–618, § 101, 82 Stat. 1213, *reprinted in* 1968 U.S.C.C.A.N. 1397, 1397.

Title II of the Act, codified at 26 U.S.C. §§ 5801–5872, amended the National Firearms Act. It deals with the imposition of taxes on the manufacture and transfer of firearms and with the registration of firearms. In that title, firearms are narrowly defined as short-barreled shotguns and rifles, machine guns, silencers and destructive devices. 26 U.S.C. § 5845(a). Title II contains no statement of congressional purpose and expresses no intention to allow any possession without registration. Lam was convicted of possessing an unregistered firearm, which is conduct covered by Title II.

The United States Sentencing Commission promulgated a single guideline to govern sentences for conduct covered by both Title I and Title II. Guideline § 2K2.1(a) sets the base offense level for unlawful receipt, possession or transportation of firearms. Subsection (b)(1) authorizes a downward adjustment if the defendant possessed the firearm "solely for lawful sporting purposes or collection." The Commentary explains that "intended lawful use, as determined by the surrounding circumstances, provides a decrease in the offense level." U.S.S.G. § 2K2.1, com-

ment. (n.2); *see also id.* (backg'd.) ("Intended lawful use, as determined by the surrounding circumstances, is a mitigating factor.").

■ From all of this, Lam leaps to the conclusion that because he held the weapon for a lawful use, self defense, the Commission was required to provide a downward adjustment for his registration offense. We do not agree.

In the first place, the purpose section is part of Title I, not Title II. The distinction is most important. Title I was intended to control the transportation of firearms and to prohibit certain classes of persons from receiving or keeping them. The purpose language indicates that Congress sought to accomplish a control function through that title, without unduly restricting lawful uses. Title II, on the other hand, is a registration title which was, quite clearly, designed to keep track of some of the most dangerous of weapons, for example, sawed-off shotguns, machine guns, bombs, and the like. 26 U.S.C. §§ 5841, 5845; *see United States v. Huffhines,* 967 F.2d 314, 321 (9th Cir.1992). Nothing in the statute suggests that there must be a lesser penalty imposed upon people who hold these exceedingly dangerous weapons for the purpose of personal protection.

Second, the mere fact that the Commission chose to treat the offenses in a single guideline does not help Lam. Perhaps that would operate to confer a benefit upon some individuals who violated Title II. It would do so by applying some considerations from the purpose clause of Title I to them. It does not follow that all conditions mentioned in Title I must be applied to registration offenses. In fact, even with respect to Title I offenses, we have never expressed any disquiet about the Commission's limitation of § 2K2.1(b)(1) to the purposes specified in the guideline—"lawful sporting purposes or collection." *See United States v. Uzelac,* 921 F.2d 204, 206 (9th Cir.1990) (personal protection is not encompassed); *but see Gavilan,* 966 F.2d at 532 n. 1 (question of lawful purposes is reserved). Other circuits have also concluded that personal protection is not covered by the language of § 2K2.1(b)(1).

*See United States v. Kissinger,* 986 F.2d 1244, 1246 (8th Cir.1993); *United States v. Cousens,* 942 F.2d 800, 803–04 (1st Cir.1991); *United States v. Wyckoff,* 918 F.2d 925, 928 (11th Cir.1990); *United States v. Wilson,* 878 F.2d 921, 924–25 (6th Cir.1989).

Finally, we do see a good deal of logic in the Commission's decision to limit the reduction to those who hold a weapon for lawful sporting or collection purposes. Neither of those purposes encompasses the killing or maiming of human beings, but personal protection surely does. Moreover, a personal protection reduction would open a great hole in the Guidelines. Even drug dealers tend to keep their weapons for personal protection purposes. In fact, it is interesting to note that personal protection claims have been made by a drug dealer, *Gavilan,* 966 F.2d at 531; a narcotics user, *Kissinger,* 986 F.2d at 1245; and a convicted felon, *Wilson,* 878 F.2d at 922.

■ In fine, we recognize that we must invalidate a guideline section which is contrary to statute. *See United States v. Quesada,* 972 F.2d 281, 282 (9th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1348, 122 L.Ed.2d 729 (1993). However, when the guidelines and the statutes are not in conflict, the guidelines control. *See United States v. Berlier,* 948 F.2d 1093, 1094–95 (9th Cir. 1991). We see no conflict here; no reason to require that a guideline score must be reduced simply because an unregistered sawed-off shotgun is possessed for the purpose of personal protection. If the guideline appears to produce an injustice in Lam's particular case, that cannot be corrected by determining that the guideline is contrary to the law.

### B. *Departure.*

Given the ubiquitous presence of guns in our society and society's somewhat ambivalent attitude toward them, it is rather easy for law-abiding citizens to run afoul of the law. Registration requirements may be the furthest thing from their minds, and an unknowledgeable person may have no idea that the law sees a vast difference between an 18½ inch barrel and a 16½ inch barrel. That can present particular problems under our sen-

tencing system, if the literal language of the Guidelines must be followed. Other courts have recognized that problem and have held that a departure from the requirements of § 2K2.1 may be available in some cases. *See United States v. Hadaway,* 998 F.2d 917, 919–20 (11th Cir.1993); *United States v. White Buffalo,* 10 F.3d 575, 576–77 (8th Cir. 1993). We agree that it may be.

■ We have often referred to the Commission's own statement that:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G. Ch. 1, Pt. A, § 4(b); *see United States v. Cook,* 938 F.2d 149, 152–53 (9th Cir.1991). That, in turn, has led us to the conclusion that when a person's behavior can be called aberrant, the person may well be taken out of the heartland and into the borderlands where a departure could be appropriate. *United States v. Dickey,* 924 F.2d 836, 838–39 (9th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991).

To recognize that possibility offers little guidance regarding the nature of the conduct that can be called aberrant. Some courts have insisted that to be truly aberrant the behavior must be a single spontaneous or thoughtless act that involves no planning and that there can be no consideration of whether it was a first offense. *See, e.g., United States v. Marcello,* 13 F.3d 752, 760–61 (3d Cir. 1994). We, however, have not been so restrictive.

In *United States v. Takai,* 941 F.2d 738 (9th Cir.1991), we determined that there was aberrant behavior where defendants, who were otherwise admirable law-abiding people, engaged in an effort to obtain green cards by bribing an Immigration and Naturalization Service official. *Id.* at 740–41. The conduct extended over a number of days, but we found that the defendants' actions were self-contradictory, naive, unreflective,

and somewhat government-induced. *Id.* at 743–44. Although the offense was committed in a series of acts over an eight-day period, we said that: "In this case there are two crimes—the forming of the conspiracy and the offer of the money. The conspiracy and the offer are so closely related that for the purposes of deciding whether they were aberrant they constitute a single act." *Id.* at 743.

Similarly, in *United States v. Fairless,* 975 F.2d 664 (9th Cir.1992), we determined that commission of an armed bank robbery constituted aberrant behavior. Despite the inherent danger of a crime where people were even forced to the ground at gunpoint, we said that it was a sufficiently spontaneous first offense, that the defendant suffered from manic depression, that the gun was unloaded, that the defendant was under extreme personal pressure, and that the acts were out of character. *Id.* at 667–68. That, we said, indicated a combination of factors, some of which were already taken into account by the Guidelines, which amounted to a single act of aberrant behavior. *Id.* at 668–69.

Lam's case, also, presents a number of convergent factors, which we will first list and then analyze further: (1) this was not a first offense for Guidelines purposes, but Lam had a background of honest and law-abiding behavior in this country for a long time; (2) the weapon was obtained for protection against crime, rather than for criminal purposes; (3) Lam obtained the weapon for the purpose of carrying out his family responsibilities as he saw them; (4) Lam was unaware of the significance of the size of the barrel and of the special need for federal registration because of that length; (5) Lam had recently had a shocking and frightening experience when three armed thugs robbed him and his pregnant sister.

(1) The fact that this was not a first offense for Guidelines purposes must give pause, for our prior cases have involved first offenders with a Criminal History Guideline score of zero. *See, e.g., Fairless,* 975 F.2d at 665; *Takai,* 941 F.2d at 741; *Dickey,* 924 F.2d at 838. But, as we have said, the

Guidelines already make allowance for first offenders and "aberrant behavior and first offense are not synonymous." *Id.* (internal quotations omitted); *see Morales,* 972 F.2d at 1011. In fact, the "heartland" discussion from which our aberrant behavior cases draw their sustenance does not itself suggest that the Criminal History score is determinative when we decide if a case is outside of the heartland. Nevertheless, in this context, calling a consistent criminal's behavior aberrant would be an oxymoron and, perhaps, make us look like oxen or morons or both. It would surely detract from the concept of singularity or spontaneity that our cases have relied upon to some extent. Therefore, attention must be paid to Lam's history.

His score of three, which places him in Criminal History Category II, is based upon the single traffic offense of driving without a license. He received one point for that and two more because when this offense was committed he was still on the one-year term of probation that was imposed as his penalty for the driving offense. We by no means intend to dispute the seriousness of the driving offense when we observe, as we must, that it does not show a past criminal history that would require us to find that Lam's conduct was anything but aberrant. In that regard, it is interesting that the offense would have generated no criminal history points whatever if the probation term had been set at one day less than a year. *See* U.S.S.G. § 4A1.2(c)(1). Thus, while Lam's criminal history must be considered, it does not itself preclude a departure for aberrant conduct.

(2) Much of Lam's argument centers on the fact that the sawed-off shotgun was possessed for personal and family protection purposes. Had it been obtained or used by him for the purpose of committing a crime, that would certainly militate strongly against any request for a departure. However, the fact that it was purchased for personal protection is not sufficient, by itself, to require a departure.

We have said that mere possession of an unregistered sawed-off shotgun "is a crime of violence." *United States v. Hayes,* 7 F.3d 144, 145 (9th Cir.1993), *cert. denied,* —— U.S.

——, 114 S.Ct. 1403, 128 L.Ed.2d 76 (1994). Those weapons "are inherently dangerous, lack usefulness except for violent and criminal purposes and their possession involves the substantial risk of improper physical force." *Id.* That is why they must be registered. Although Lam did not obtain the gun for a criminal purpose, he did obtain it for the violent purpose of using it on or to ward off other people. The weapon is exceedingly dangerous and deadly, and even when the owner has a good heart those characteristics remain. Neither Congress nor the Commission limited punishment for the offense to those who possess the guns for evil reasons.

We are aware of the fact that the Commission has said that an intended lawful use is a mitigating factor. U.S.S.G. § 2K2.1, comment. (n.2 & backg'd.). However, when those statements are construed with the guideline itself, it seems apparent that the Commentary refers to the inclusion of the sporting purposes and collection factor in the guideline. *See United States v. Anderson* 942 F.2d 606, 609–14 (9th Cir.1991) (en banc).

We are also reluctant to agree with the suggestion that Lam's possession of the weapon for the purpose of protecting himself and his family *is* a "lesser harm" pursuant to Guideline Policy Statement § 5K2.11. It is true that the main concern of the law must be the use of unregistered weapons of this type by criminals. But possession by honest citizens is also a serious danger to others. It is significant that the example of a lesser harm in the policy statement itself is of a person who holds a dangerous weapon as a trophy—a use not unlike the "collecting" referred to in § 2K2.1(b)(1). That example helps to distinguish this case from *Hadaway* and *White Buffalo.* In the former, the Eleventh Circuit determined that a collector's possession of a sawed-off shotgun for parts and as a curiosity was a lesser harm. 998 F.2d at 919–20. In the latter, the Eighth Circuit determined that possession of a sawed-off rifle for the purpose of hunting skunks, weasels and raccoons which had hidden under buildings and preyed on the defendant's chickens was a lesser harm. 10 F.3d at 576–77. Significantly, the former case is very close to "collecting" and the latter case

is very close to "sporting purposes."[2] More significantly, in neither case was the weapon held for the purpose of shooting or threatening human beings.

Thus, while the personal defense factor can and must be considered, it does not, by itself, demonstrate aberrant behavior. It is just another circumstance.

(3) We have mentioned Lam's family responsibilities. We are aware of the fact that his family ties and responsibilities cannot usually be considered as a ground of departure. U.S.S.G. § 5H1.6. However, as we said in *Quesada*, that does not preclude considering those relationships when aberrant behavior is an issue. 972 F.2d at 283. Consideration of family responsibilities is particularly proper where, as here, the defendant felt the pull of those responsibilities very strongly, and fulfilling them was the reason he obtained the weapon.

(4) Lam's ignorance of the law regarding the length of gun barrels and the special requirement of federal registration because of that length does not excuse him. *See, United States v. O'Mara,* 963 F.2d 1288, 1290–91 (9th Cir.1992). Still, it is one of the many circumstances that we can consider when we try to decide whether his conduct was truly aberrant.

(5) Finally, we have mentioned the fear caused when three thugs robbed Lam and his sister at their place of business. That fear was exacerbated because the family often worked as late as midnight and was somewhat isolated when neighboring businesses closed, which was much earlier. No one would hear a call for help. Again, we see this psychological or motivating factor as just one more piece of evidence that can be considered. *Cf. Fairless,* 975 F.2d at 668 (financial difficulty and job loss put extreme pressures on the defendant).

Taking all of these factors together and taking Lam's statements as true, as the district court did, we hold that the district court did have the discretion to depart on the ground that Lam's behavior was aberrant.

## CONCLUSION

Lam, an otherwise law-abiding immigrant to our country, obtained a weapon for the purpose of protecting his family against the kind of predators who are all too prevalent in our cities. He did so after he and his pregnant sister were robbed by three masked gunmen who entered their place of business. Unfortunately for him, the weapon he obtained was a registerable sawed-off shotgun, a fact that he was not aware of. Nothing in this record indicates that Lam has engaged in serious criminal activity before. Nothing indicates that he will do so in the future. In short, the district court was not without discretion. It could have considered departure on the ground of aberrant behavior, and it erred when it found no way to consider the unique confluence of circumstances in Lam's case. That is not to say that the district court must depart; it is only to say that the district court may consider doing so.

VACATED AND REMANDED.

---

**2.** It seems very difficult to say that slaying wild animals as recreation is "sport," while slaying them for less frivolous reasons is not. At any rate, the uses are very close.