**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Ivan Leon ROJAS, Defendant–Appellee.**

**No. 93–5127.**

United States Court of Appeals,
Eleventh Circuit.

March 16, 1995.

Julia A. Paylor, Asst. U.S. Atty., Kendall Coffey, U.S. Atty., Harriett R. Galvin, Linda Collins Hertz, Asst. U.S. Attys., Miami, FL, for appellant.

Gerardo Andres Remy, Jr., Miami, FL, for appellee.

Before HATCHETT and ANDERSON, Circuit Judges, and FAY, Senior Circuit Judge.

HATCHETT, Circuit Judge:

The government brings this appeal challenging Ivan Leon Rojas's sentence. We hold that the district court misapplied the United States Sentencing Guidelines in granting Rojas a downward departure; thus, we remand for resentencing.

## FACTS

On January 26, 1993, Ivan Leon Rojas departed from Florida aboard a Bahamian registered vessel. Three days later, members of the United States Coast Guard boarded the vessel while it was anchored approximately 200 miles southeast of Miami and 50 miles north of Cuba. A search of the boat revealed ammunition, explosives, machine guns, and automatic rifles equipped with grenade launchers.

After being arrested, Rojas admitted that the weapons were loaded onto the boat in Marathon, Florida, and that he was attempting to smuggle them into Cuba in order to aid the resistance efforts against the Castro regime. Rojas also stated that an "organization" had helped him coordinate the mission, but refused to identify the organization.

## PROCEDURAL HISTORY

A federal grand jury in the Southern District of Florida returned an indictment against Rojas charging him with one count of knowing possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d). On July 6, 1993, Rojas pleaded guilty to the one count in the indictment.

On September 10, 1993, the district court held a sentencing hearing. Applying the Sentencing Guidelines to Rojas's case, the United States Probation Office calculated a term of imprisonment of 24 to 30 months based on a total offense level of 17 and a criminal history category of I. Rojas did not contest this calculation, but instead asked the district court for a downward departure based on the lesser harms provision of the Sentencing Guidelines, U.S.S.G. § 5K2.11. Rojas argued that section 5861(d) is meant to protect Americans from unregistered firearms on American soil, but that Coast Guard personnel arrested him in Bahamian waters while transporting weapons out of the United States. Furthermore, Rojas contended that in transporting the weapons, he sought to avoid a greater harm, the total destruction of a country and the annihilation of its citizens. Rojas also asked the district court to consider the fact that, historically, juries in the

Southern District of Florida have acquitted defendants charged with similar offenses.

The district court granted Rojas's request for a downward departure pursuant to U.S.S.G. § 5K2.11. Accordingly, it sentenced Rojas to two years probation. The government appeals.

## CONTENTIONS

The government contends that the district court erred in granting a downward departure under U.S.S.G. § 5K2.11 because section 5861(d) seeks to prevent the harms associated with Rojas's conduct. The government further argues that a defendant's subjective views of foreign policy may not serve as a basis for a sentence reduction.

Rojas responds that the district court correctly granted him a downward departure under the lesser harms provision of the Sentencing Guidelines because section 5861(d) is not intended to reach the peculiar facts of this case; likewise, he argues that he transported the weapons in order to avoid a perceived greater harm.

## ISSUE

The issue is whether a defendant convicted of possessing unregistered firearms is entitled to a downward departure under the Sentencing Guidelines because he was attempting to transport the firearms to a resistance movement in a foreign country.

## DISCUSSION

We have jurisdiction over the government's appeal pursuant to 18 U.S.C. § 3742(b). *See United States v. Godfrey,* 22 F.3d 1048, 1053 (11th Cir.1994) (vacating downward departure in a section 5861(d) case). In Sentencing Guidelines cases, we review the district court's findings of fact for clear error and its application of law to those facts *de novo. See United States v. Salemi,* 26 F.3d 1084, 1086 (11th Cir.1994) (reversing downward departure under U.S.S.G. § 5K2.11). On this appeal, we need only

1. Title 26 U.S.C. § 5861(d) provides: "It shall be unlawful for any person to receive or possess a firearm which is not registered to him in the

review the legal questions concerning the district court's application of the Sentencing Guidelines; thus, the *de novo* standard applies throughout our analysis. *See Godfrey,* 22 F.3d at 1053.

## I. The Second Prong of U.S.S.G. § 5K2.11

The focus of this appeal has been on the second prong of U.S.S.G. § 5K2.11, which permits downward departures in instances where "conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue." Accordingly, we must resolve the legal question of whether section 5861(d) seeks to prevent the harms caused as a result of Rojas's conduct.[1] The appropriate starting point for this determination is the statute's legislative history.

Section 5861(d) is part of the "National Firearms Act (Act), 26 U.S.C. §§ 5801–5872, [which] imposes strict registration requirements on statutorily defined 'firearms.'" *Staples v. United States,* —— U.S. ——, ——, 114 S.Ct. 1793, 1795, 128 L.Ed.2d 608 (1994).

In 1934, when Congress originally enacted the statute, it limited the coverage of the 1934 Act to a relatively narrow category of weapons such as submachineguns and sawed-off shotguns—weapons characteristically used by professional gangsters like Al Capone, Pretty Boy Floyd, and their henchmen. At the time, the Act would have had little application to the guns used by hunters or guns kept at home as protection against unwelcome intruders. Congress therefore could reasonably presume that a person found in possession of an unregistered machinegun or sawed-off shotgun intended to use it for criminal purposes. The statute as a whole, and particularly the decision to criminalize mere possession, reflected a legislative judgment that the likelihood of innocent possession of such an unregistered weapon was remote, and far less significant than the interest in depriving gangsters of their use.

National Firearms Registration and Transfer Record."

*Staples,* —— U.S. at ——, 114 S.Ct. at 1808 (Stevens, J., dissenting). In passing the Act, "Congress felt that such control was necessary to curb the growing frequency of crimes of violence in which people were killed or injured by the use of such dangerous weapons." H.R.Rep. No. 1714, 82d Cong.2d Sess., *reprinted in* 1952 U.S.C.C.A.N. 1454; *see also United States v. White Buffalo,* 10 F.3d 575, 576–77 (8th Cir.1993) ("the legislative history shows the 'harm or evil' the law seeks to prevent is violent crimes and loss of human life").

"Congress subsequently amended the statute twice, once in 1968 and again in 1986." *Staples,* —— U.S. at ——, 114 S.Ct. at 1813 (Stevens, J., dissenting). Congress enacted the 1968 amendments as part of Title II of the Gun Control Act of 1968. "Title II contains no statement of congressional purpose and expresses no intention to allow *any* possession without registration." *United States v. Lam,* 20 F.3d 999, 1001 (9th Cir.1994) (emphasis added). Title I of the Gun Control Act, however, does contain a statement of purpose and some relevant legislative history.[2] In particular, Congress continued to emphasize the "senseless slaughter" which dangerous firearms cause. H.R.Rep. No. 1577, 90th Cong.2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 4410, 4413. Congress also noted that it did not intend to place any undue restrictions on hunting, sport shooting, gun collecting, and protecting the home. *See* Pub.L. No. 90–618, § 101, 82 Stat. 1213, *reprinted in* 1968 U.S.C.C.A.N. 1397, 1397; H.R.Rep. No. 1577, 90th Cong.2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 4410, 4413–15.

After considering this history and Congress's deep-rooted concern with the loss of human life, we conclude that section 5861(d) was intended to reach the harms connected with Rojas's conduct; therefore, he is not entitled to a downward departure under the second prong of U.S.S.G. § 5K2.11. In explaining when a downward departure would be appropriate, the Sentencing Guidelines use the example of "a war veteran [who] possesse[s] a machine gun or grenade as a trophy." U.S.S.G. § 5K2.11. This example fits into one of the categories of conduct that Congress has historically been wary of unduly restricting—gun collection.[3] Similarly, the Eighth Circuit recently held that a defendant, who was convicted of a violation of section 5861(d), was entitled to a downward departure under U.S.S.G. § 5K2.11 because he used the unregistered gun to shoot animals that preyed on his chickens and often hid in crawl spaces underneath the shacks next to his house. *White Buffalo,* 10 F.3d at 576. Again, that defendant's conduct arguably fell under three of the categories—hunting, sport shooting, and protecting the home. Rojas's conduct, on the other hand, does not fall into any one of these traditional categories; therefore, he is not entitled to a departure. *See Lam,* 20 F.3d at 1004–05 (distinguishing *White Buffalo* and the trophy example on the same grounds and emphasizing that "in neither case was the weapon held for the purpose of shooting or threatening human beings"); *see also United States v. Warner,* 43 F.3d 1335, 1338 (10th Cir.1994) (distinguishing *White Buffalo* and reversing downward departure under section 5K2.11 emphasizing that "the lesser harms rationale for departing from the Sentencing Guidelines should be interpreted narrowly").

---

2. Title I, "codified at 18 U.S.C. §§ 921–928, generally concerns the transportation and sale of firearms and the licensing of manufacturers, dealers, importers, and collectors of firearms. It also prohibits certain individuals from holding firearms." *Lam,* 20 F.3d at 1001.

3. This is not to say that a defendant convicted of a violation of section 5861(d) is automatically entitled to a downward departure if the possession of the weapon was for the purposes of gun collection. Indeed, in *United States v. Hadaway,* 998 F.2d 917 (11th Cir.1993), the defendant, who was convicted of a section 5861(d) charge, claimed that he was only collecting guns. We remanded to the district court for consideration of whether a downward departure was warranted under U.S.S.G. § 5K2.11, but also noted that Congress "did not require that possession be accompanied by intent to use the unregistered [weapon] to commit a violent felony." *Hadaway,* 998 F.2d at 920 n. 5. We also commented that "the inherent lethality and *potential* for use in criminal activity led Congress to proscribe possession of an unregistered" set of weapons. *Hadaway,* 998 F.2d at 920 n. 5. These comments suggest that the defendant may not have been entitled to a departure.

Congress specifically sought to prevent the harms that could potentially result from Rojas's conduct. In enacting the 1968 legislation, Congress highlighted the role of dangerous weapons in situations where political passions have run wild. Congress emphasized that "[i]n the Detroit riot of 1967, and again in the civil disorders of April 1968, the weapon of the sniper was the rifle. President Kennedy, Martin Luther King, Jr., [and] Medgar Evers ... were all shot by rifles or shotguns." H.R.Rep. No. 1577, 90th Cong.2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 4410, 4413. The merits of Rojas's politics aside, the potential harm associated with his conduct resembles the political violence that Congress described.[4] Rojas contends that he was shipping the weapons out of the United States and therefore Americans could not have been injured on American soil. All we need to ask, however, is what might have happened if Rojas encountered a pro-Castro demonstration while he was loading the weapons in Marathon, Florida. In sum, because the Act specifically seeks to prevent this potential bloodshed, the district court erred in granting Rojas a downward departure based on the second prong of U.S.S.G. § 5K2.11.[5]

## II. The First Prong of U.S.S.G. § 5K2.11

The first prong of U.S.S.G. § 5K2.11 recognizes that a downward departure may be appropriate when a defendant commits "a crime in order to avoid a perceived greater harm.... provided that the circumstances significantly diminish society's interest in punishing the conduct." To illustrate when a departure is not appropriate because society's interest in punishment is not diminished, the guideline states: "For example, providing defense secrets to a hostile power should receive no lesser punishment simply because the defendant believed that the government's policies were misdirected." U.S.S.G. § 5K2.11.

This example is directly applicable because Rojas contends that he committed his criminal act for political reasons, specifically, to liberate the people of Cuba. The Sentencing Guidelines, however, clearly indicate that a defendant is not entitled to a downward departure because of a personal belief that the criminal action is furthering a greater political good. Rojas argues that in the example, the defendant is aiding a hostile power and hindering American foreign policy. On the other hand, he sought to defeat a hostile power and thereby aid American foreign policy. This distinction is meaningless, for the example's clear import is that the lesser harm's provision should not apply to "loose cannons" like Rojas because society has a significant interest in deterring "one-man state departments." As a result, we hold that Rojas is not entitled to a downward departure under the first prong of U.S.S.G. § 5K2.11.

## CONCLUSION

For the reasons stated above, we vacate Rojas's sentence and remand for resentencing in accordance with this opinion.

**REVERSED AND REMANDED.**

FAY, Senior Circuit Judge, dissenting:

This is a most respectful dissent in a strange case. I have no quarrel with the soundness of the majority opinion. What troubles me is the uniqueness of the relationship between the United States and Cuba.

Section 5K2.0 states in part:

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circum-

---

4. In arguing for a downward departure, Rojas asked the district court to consider that Southern Floridians sympathize with his political views, pointing out that juries in the Southern District of Florida have acquitted other defendants charged with similar offenses. We have specifically rejected such an argument. *See Hadaway,* 998 F.2d at 920–21 ("we join the First and Fifth Circuits in holding that departures based on

'community standards' are not permitted under the Sentencing Guidelines").

5. We note that implicit in our discussion is a finding that Rojas's case does not warrant a downward departure because it involves circumstances that distinguish it "from the 'heartland' cases covered by the guidelines." U.S.S.G. § 5K2.0.

stance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from the described."

There is simply no way that the Sentencing Commission, nor anyone else, could consider our country's position as to Cuba or its present leader on any day or during any particular time period. The reason for this is simple—our country's policy toward Cuba changes rapidly (some would say on a daily basis) and has from the time of the tragic fiasco at the Bay of Pigs to present. This is not meant to be critical of any of the responsible authorities. It is merely stated as a fact of life.

That being the situation it seems to me that the law grants the sentencing judge the discretion to depart from the sentencing guidelines. This is precisely what the district court did in sentencing the appellant.

The departure downward has nothing to do with the appellant's politics or subjective beliefs as discussed in Section 5K2.11. It has to do with the diplomatic position of the United States government, activities supported by our government which are aimed toward the removal of Castro and whether or not cases such as this fall outside the "heartland" of cases covered by the guidelines. § 5K2.0.

This vessel was registered in the Bahamas and was stopped either on the high seas or in Bahamian waters many miles outside of those claimed by the United States. There was no incident in Marathon, Florida, nor anywhere else within the United States. And, it is certainly not clear to me that we have a national policy against providing arms and other support to those in Cuba who oppose Castro. It may come as news to others as well.

Based upon the bizarre nature of our country's policies relative to Cuba, I would find that such was not considered by the Sentencing Commission and therefore, under the law, the district court had the discretion to depart downward. I would affirm the judgment of the district court.