**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John Timothy PIERSON, Defendant–
Appellant.**

**No. 95–30185.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1997.

Decided Aug. 21, 1997.

As Amended Nov. 3, 1997.

Kevin F. McCoy, Assistant Federal Defender, Anchorage, Alaska, for Defendant–Appellant.

Daniel S. Goodman, United States Department of Justice, Washington, DC, for plaintiff–appellee.

Before WALLACE, JOHN T. NOONAN, JR., and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge.

John Timothy Pierson appeals his jury conviction and sentence for one count of conspiring to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and two counts of using a communication facility in the commission of a drug trafficking offense in violation of 21 U.S.C. § 843(b). He contends that (1) the district court abused its discretion by admitting at trial a co-conspirator's testimony that the co-conspirator's family received anonymous threats of physical harm after the co-conspirator was arrested, and (2) the district court erroneously concluded at sentencing that it did not have the legal authority to grant a downward departure for aberrant behavior. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742 and we affirm.

## FACTS

From at least April 1993 through December 1993, Pierson participated in an ongoing conspiracy to distribute cocaine for members of the Colombian Cali Cartel. He organized and managed a trucking company which transported multi-kilogram loads of cocaine from the Los Angeles, California area to the Seattle, Washington area, and from the Seattle area to the New Jersey/New York area.

Pierson and his business partner Gunnar Rooth started a commercial trucking venture in 1992 called Multi–Freight Services Trucking (MFS) which hauled produce from Anchorage to Fairbanks, Alaska. In early 1993, Pierson told Frank Plunk, a former business associate, that he was interested in expanding his trucking operation and was looking for financing. Pierson was aware that Plunk had been involved in selling drugs for several years. When Plunk arranged for Pierson to meet Richard Janis, an acquaintance of Plunk's who expressed interest in financing the expansion of MFS, Pierson attended the meeting in Seattle.

Janis and the people who worked for him were cocaine distributors for the Cali Cartel. At their meeting in Seattle, Janis told Pierson that he was looking for someone to haul "produce" from California to New Jersey. He offered to finance the project including the purchase of trucks and procurement of warehouses in the Los Angeles, Seattle, and New York areas. Janis asked Pierson to prepare a cost estimate. He told Pierson that if he accepted the proposal, he would have to pay Pierson in cash. Pierson did not

have a problem with that. Pierson was to be paid approximately $300 per kilogram of cocaine transported.

Pierson did not tell his partner Rooth the whole truth about Janis or the scope of the trucking project. Instead, he told Rooth that another trucking company with whom MFS had previously conducted business was involved in the financing and would need to pay MFS in cash because it was selling some of its old equipment and had a cash surplus.

Within a week, Pierson and Rooth researched the costs of operating a trucking distribution route in "the lower 48" and submitted a formal proposal to Plunk who faxed it to Janis. The proposal stated they needed $300,000 to get their trucking project underway. Within another week, Plunk called Pierson and told him that Janis had accepted the proposal.

On May 8, 1993, Pierson received $56,000 in cash from Janis through Plunk. Shortly thereafter, Pierson flew to Seattle, Los Angeles, and New York City to buy trucks and obtain warehouses needed for the trucking venture. Pierson also hired several truck drivers, arranged to get the necessary shipping permits, and subscribed to a paging service. While in New York, one of Janis's employees came to Pierson's hotel and dropped off a briefcase or duffel bag containing $76,000 in cash. MFS received large cash payments on several other occasions. Pierson personally brought all of the money to the MFS office.

Carlos Serrato worked for the branch of the cocaine organization responsible for transporting the cocaine from the West Coast to the East Coast of the United States. In July 1993, Pierson met Serrato and three other men in Los Angeles and drove them to a nearby warehouse. He told them he had rented the warehouse for the purpose of loading his commercial trucks with boxes of produce which would also contain cocaine. Pierson then escorted Serrato and the others to a house where he showed them a box containing a vacuum-sealing machine which was to be used to vacuum-seal bags of cocaine to avoid detection by drug-sniffing dogs. Pierson gave the machine to Serrato.

A few days later, Pierson gave Serrato the keys to the warehouse and informed him that he would be in charge of opening and closing the warehouse. Pierson instructed Serrato on how to pack the boxes that would be filled with both vegetables and cocaine to avoid detection of the cocaine. He also explained how to make the warehouse operation appear legitimate to outsiders.

Soon after, Pierson traveled to the Seattle area and New Jersey with Serrato's boss, Tony Fonnegra, and showed Fonnegra the warehouses and arrangements he had set up in those places.

In late summer of 1993, Pierson organized a "practice" run. An MFS truck transported boxes containing only produce from Los Angeles to Seattle. Pierson then organized the first truck delivery containing cocaine. The truck departed from the Los Angeles area warehouse on September 7, 1993, and arrived in the Seattle area warehouse two days later. It continued on to East Rutherford, New Jersey. The truck transported eight boxes, six of which contained cocaine.

In October and November of 1993, MFS trucks made four or five more trips from the Los Angeles area warehouse, to the Seattle area warehouse and then to the New Jersey warehouse. Each truck contained between 200 and 250 kilograms of cocaine. On each occasion, Pierson was in regular contact with the drivers and supervised their actions.

Just as the cartel was planning to expand Pierson's cocaine trucking operation to Houston, Texas, law enforcement officers arrested Pierson, Serrato and Plunk. Other cartel members escaped to Colombia.

At Pierson's trial, Serrato testified as a government witness. Over Pierson's objection, the court admitted Serrato's testimony that his family had received anonymous threats after his arrest. Pierson was convicted, sentenced, and this appeal followed.

## DISCUSSION

### A. Evidence of Threats to Serrato's Family

■ Pierson contends the district court abused its discretion by admitting government witness Serrato's testimony that his

family received anonymous threats of physical harm after he was arrested. Pierson contends this testimony violated Federal Rules of Evidence 402, 403, 404(b) and 901, and rendered his trial fundamentally unfair. He argues it was "fundamentally unfair" for the district court to permit this testimony "without a scintilla of evidence linking the alleged threats to Mr. Pierson or anyone associated with him." He argues the testimony was extremely prejudicial because "[t]he only reasonable inference from [Serrato's] testimony was that Mr. Pierson sponsored the threats in an attempt to silence Serrato."

We do not agree that the only reasonable inference from Serrato's testimony is that Pierson sponsored the threats. In light of Serrato's entire testimony, a more likely inference is that other cartel members threatened Serrato's family after Serrato was arrested in an attempt to keep Serrato from revealing his knowledge of the cartel's activities. As Pierson observes in his brief, nothing in the record suggested that Pierson had anything to do with these threats or even knew about them, and the government never attempted to make any connection between Pierson and the threats.

Moreover, the evidence was relevant to Serrato's credibility by explaining his motive for testifying against his former co-conspirator. Viewed in context, it is clear that Serrato's testimony regarding the threats was introduced to show that the only incentive the government offered Serrato to testify against Pierson was assistance in protecting his wife from drug operatives in Colombia.[1] Evidence of the threats was relevant to show why Serrato's family needed protection. *See United States v. Castleberry*, 642 F.2d 1151, 1153 (9th Cir.1981) (noting that a former co-conspirator's testimony that he had received threats following his arrest was relevant to explain why the witness was cooperating with the government in exchange for protection).

The cases Pierson relies on are inapposite. In *Ortiz–Sandoval v. Gomez*, 81 F.3d 891 (9th Cir.1996), we considered the prejudicial effect of evidence that the defendant himself had threatened two witnesses. *Id.* at 897. Here, in contrast, there was no evidence that Pierson made the threats. Furthermore, in *Ortiz–Sandoval,* we concluded that the trial court did not abuse its discretion by admitting the evidence and that its admission did not render the trial fundamentally unfair. *Id.* at 898. In *United States v. Harrison–Philpot*, 978 F.2d 1520 (9th Cir.1992), we held that the admission of evidence that the defendant himself had made threats in the past violated rule 404(b)'s prohibition of evidence of prior bad acts on the part of the defendant. *Id.* at 1527. Here, no evidence was introduced that *Pierson* committed any prior bad acts.

In sum, the district court did not abuse its discretion by admitting into evidence Serrato's testimony about threats to his family following his arrest.

## B. Lack of Authority to Depart Downward for Aberrant Behavior

Pierson requested a downward departure for aberrant behavior. At his sentencing hearing, the district court stated:

I need to make it very clear for the record here, because I am not going to grant the

---

1. The testimony was offered in the following context:

Q. Did you make a bargain with the Government for your testimony?
A. No.
Q. Have you been made any promises by me or any other prosecutor?
A. No.
Q. ... Why are you testifying? Why are you here?
A. Because I would like to show very clearly and clarify ... how my participation had to do with this ... transport of cocaine from California.
Q. Did you request assistance from the Government for your family?
A. Yes. Because my wife has been threatened.
Q. And what did you ask for?
A. That she ... be brought up here and that she would also just be able to have an opportunity to work.
Q. Did you ... say that you would only testify if she came?
A. Yes.
Q. And has your family received threats since you have been arrested? ...
A. Since I have been arrested, various members of my family have received calls. I have family in Bogota and I have family in Cali. In both of these places my family—parts of my family have received threats.

motion for a downward departure because I don't think that I have the authority to do that under the facts here, that is a decision that I make for purpose of the record, consciously knowing that that decision can be reviewed by a court of appeals.

Sentencing Hearing, May 17, 1995, Transcript at p. 99.

In explaining why it believed it lacked authority to depart downward, the district court stated: "[f]or a very substantial period of time, ... [Pierson] engaged in a conspiracy to distribute cocaine across the United States." *Id.* In the court's "Memorandum of Sentencing Hearing and Report of Statement of Reasons" dated May 17, 1995, the district court made the following entry: "Is defendant entitled to downward departure for 'aberrant behavior' or 'totality of circumstances.' Held: no."

■ We understand the district court's decision to be equivalent to a determination that Pierson's behavior "as occurring in the particular circumstances" did not "take [the case] outside the heartland of the applicable Guideline." *Koon v. United States,* —— U.S. ——, ——, 116 S.Ct. 2035, 2051, 135 L.Ed.2d 392 (1996). We review a district court's departure decision for abuse of discretion. *Id.* at —— —— ——, 116 S.Ct. at 2047–48.

We have long recognized that where a defendant's behavior can be called aberrant, he may be eligible for a downward departure due to mitigating factors not adequately taken into consideration by the Sentencing Commission. *See* 18 U.S.C. § 3553(b). *See also United States v. Green,* 105 F.3d 1321, 1323 (9th Cir.1997); *United States v. Lam,* 20 F.3d 999, 1003 (9th Cir.1994); *United States v. Morales,* 972 F.2d 1007, 1011 (9th Cir. 1992); *United States v. Fairless,* 975 F.2d 664, 667 (9th Cir.1992). "While we have not required that the behavior be a single spontaneous or thoughtless act involving no planning, we have to some extent relied on the concept of 'singularity or spontaneity.'" *Green,* 105 F.3d at 1323 (citing *Lam,* 20 F.3d at 1004). "We have also placed considerable emphasis on a defendant's motivations and any surrounding extenuating circumstances." *Id.*

Thus, in *United States v. Takai,* 941 F.2d 738 (1991), we determined that the defen-

dants were eligible for the aberrant behavior departure where their attempt to bribe an Immigration and Naturalization Service official to obtain green cards spanned a period of only eight days and was motivated by a desire to help friends and family members rather than obtain financial gain. *Id.* at 743–44. In *Lam,* we held that a defendant's possession of a sawed-off shotgun could constitute aberrant behavior where the gun was purchased out of concern for family safety shortly after the family had been robbed. *Lam,* 20 F.3d at 1005.

■ Pierson argues his behavior was aberrant because he was a hard-working, law-abiding, exemplary citizen before he became involved in the cocaine distribution conspiracy. We have held, however, that an absence of criminal history is not synonymous with aberrant behavior. *See Green,* 105 F.3d at 1323 (citing *Takai,* 941 F.2d at 743). Criminal history is taken into account by the Sentencing Guidelines. *Green,* 105 F.3d at 1323. Further, a defendant's exemplary life prior to his criminal involvement does not, by itself, justify a departure for aberrant behavior, *United States v. Carey,* 895 F.2d 318, 325 (7th Cir.1990).

Here, Pierson's criminal conduct reached a significant level of regularity and spanned a considerable period of time. We recently held that a district court abused its discretion by granting a downward departure for aberrant behavior where the defendant was involved for at least a few months in a significant, well planned marijuana operation for no reason other than financial gain. *See Green,* 105 F.3d at 1323. We have also cited with approval *Carey,* 895 F.2d at 325 in which the court held as a matter of law that the defendant was not entitled to a downward departure for aberrant behavior where his involvement in a check-kiting scheme spanned a period of at least fifteen months and required extensive planning and hundreds of overt acts in furtherance of the crime. *See, e.g., United States v. Dickey,* 924 F.2d 836, 839 (9th Cir.1991); *Fairless,* 975 F.2d at 667.

*Green* and *Carey* apply here. Pierson's participation in the cocaine distribution scheme required substantial planning and involved hundreds of overt acts spanning a period of at least eight months. We conclude

the district court did not abuse its discretion in holding that Pierson was not entitled to a downward departure for aberrant behavior.

AFFIRMED.