**UNITED STATES of America, Plaintiff,**

v.

**Gabriel MARTINEZ–VILLEGAS, Sr., et al., Defendants.**

**No. CR 96–1123 DWW.**

United States District Court,
C.D. California,
Western Division.

Feb. 2, 1998.

Duane R. Lyons, Asst. U.S. Atty., Los Angeles, CA, for U.S.

Scott S. Furstman, Santa Monica, CA, for Defendant Gabriel Martinez–Villegas, Sr.

Michael Norris, Michael Norris, Inc., Redondo Beach, CA, for Defendant Gabriel Martinez–Villegas, Jr.

Fred Browne, Santa Monica, CA, for Defendant Juvetino Martinez Gutierrez.

## MEMORANDUM OPINION

DAVID W. WILLIAMS, Senior District Judge.

Defendants Juvetino Gutierrez ("Gutierrez"), Gabriel Martinez–Villegas, Sr. ("Villegas, Sr.") and Gabriel Martinez–Villegas, Jr. ("Villegas, Jr.") (father and son, collectively, "Villegases") were each charged in a two count indictment, with one count of conspiracy, in violation of 21 U.S.C. § 846, and one count of attempted possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 846.

In June, 1996, a confidential informant working with the Drug Enforcement Administration ("DEA") met with defendant Gutierrez. Gutierrez stated that he was in the business of buying and transporting cocaine, and that he and his associates had trailers that could be used to transport narcotics. The confidential informant told Gutierrez that he worked for someone who was willing to sell 300 kilograms of cocaine.

On June 12, 1996, the confidential informant and an undercover DEA agent posing as a Latin American drug lord, met with Gutierrez. During the meeting, the undercover agent told Gutierrez that he was willing to sell a large quantity of cocaine. The undercover agent stated that he would sell 50 kilograms of cocaine at a time, at a purchase price of $15,500.00. Gutierrez then said that he was not interested in buying cocaine but knew someone who may be willing to transport cocaine. The undercover agent then stated that he needed someone to transport 100 kilograms of cocaine to Detroit, Michigan. Gutierrez replied that he would ask his "contact" how much he would charge to transport the cocaine, and agreed to meet with the undercover agent in the future. .

On June 20, 1996, Gutierrez, the undercover agent, and the confidential informant again met. The Villegases were not present. Gutierrez, again, stated that he would find out whether his contact would be willing to transport cocaine.

Through Gutierrez, the confidential informant was introduced to Villegas, Sr. and, later, Villegas, Jr. Evidence at trial showed that the confidential informant repeatedly contacted the Villegases in hopes of placing them in contact with the undercover agent. Villegas, Sr. also testified that the confidential informant, on several occasions, both in person and by telephone, had tried to persuade him to meet with the undercover agent. Eventually, a meeting was arranged between the Villegases and the undercover agent.

On July 18, 1996, the Villegases were introduced to the undercover agent by the confidential informant. At the meeting, the undercover agent asked the Villegases if they owned any trucks. Villegas, Sr. indicated that he and his son owned several trucks. Villegas, Jr. gave the undercover agent a brochure of their trucking business which showed a picture of the Villegases and a truck. On the brochure was the name "Gavima & Sons." At the meeting, the undercover agent told the Villegases that he was willing to pay $500.00 per kilogram to transport cocaine and that he wanted to begin with 100

kilograms, and informed the Villegases that he had buyers in both Detroit and Chicago.

The undercover agent told the Villegases that he did not deal in small quantities but rather he delivered between 100 and 500 kilograms of cocaine at a time. In addition, he told the Villegases that he needed someone with experience to transport the narcotics, and that if they did not have any experience he would not work with them. The Villegases then replied that they were experienced, and had transported between 5 to 10 kilograms of cocaine in the past. They further stated that they had been involved in the transportation of narcotics for approximately five years and had also transported narcotics to the eastern United States. They agreed to meet with the confidential informant again.

On August 5, 1996, the undercover agent and the confidential informant again met with the Villegases. Gutierrez was also present. The undercover agent told the Villegases that he had received a telephone call from one of his buyers in San Francisco, who requested 100 kilograms of cocaine as soon as possible. The undercover agent asked the Villegases if they could make the delivery to San Francisco. The Villegases agreed to deliver the cocaine. It was also agreed that the Villegases would be paid $300.00 per kilogram to transport the cocaine, and that Gutierrez would receive five percent of this amount. The undercover agent also agreed to pay Gutierrez an extra five percent for his efforts in introducing him to the Villegases.

The undercover agent then told the Villegases that he would tell them the following day where to pick up the 100 kilograms of cocaine, and instructed Villegas, Sr. to bring his son, and no one else, to assist him with the transportation of the cocaine.

Two days later, on August 7, 1996, Gutierrez, the undercover agent, and the confidential informant met Villegas, Jr. for the purpose of providing him with the cocaine. As instructed, Villegas, Jr. arrived in an 18–wheel truck, which he drove. Villegas, Sr., however, was not present. The undercover agent then uncovered a large container which he said held approximately 92 kilograms of cocaine.

After loading the container onto the truck, Villegas, Jr. asked the undercover agent for the address in San Francisco where he wanted the cocaine to be delivered. The undercover agent told him that he would provide him with the address after he left the parking lot. Villegas, Jr. boarded the truck and began to pull forward. At that point, both Villegas, Jr. and Gutierrez were arrested. After the arrest, Villegas, Jr. was instructed to call his father and explain to him that he had been arrested by the DEA. The following morning, Villegas, Sr. voluntarily surrendered.

The Villegases were then questioned by the DEA. The Villegases told the DEA that they did not have any prior narcotics dealings, and that this was the first time they had been involved with narcotics. They also stated that they were uncomfortable when they were solicited to transport narcotics but that they were enticed to do so by the money offered by the undercover agent. The Villegases stated that they had no further information to provide to the DEA agents because they had never been involved in the transportation of narcotics.

No indictment was returned. However, for some reason not fully disclosed by the government, the Villegases were released, presumably, after agreeing to cooperate with the DEA in further investigations.

Nearly four months later, on December 4, 1996, the Villegases were rearrested, apparently because they were only able to provide limited assistance to their DEA handlers. Although a period of almost four months had elapsed between the date of their arrest and subsequent re-arrest, the government failed to explain the reason for this substantial lapse in time, and has never accounted for the Villegases activities or efforts during those four months. Nevertheless, an indictment was filed against the Villegases and Gutierrez on December 13, 1996, charging them with offenses which occurred between June and August of 1996.

Pursuant to a plea agreement, Gutierrez pled guilty on May 28, 1997. Gutierrez received a sentence of 37 months of incarceration. Villegas, Sr. and Villegas, Jr. pled not

guilty, and were subsequently found to be indigent. Villegas, Sr. was appointed counsel from the Federal Public Defender's Office. Villegas, Jr. was appointed counsel from the indigent defense panel. On June 24, 1997, following a jury trial, the Villegases were convicted on both counts. The Court referred the Villegases to the United States Probation Office for investigation and report. A sentencing hearing was scheduled for September 8, 1997.

The presentence report, and the addendum to the presentence report, calculated both Villegas, Sr. and Villegas, Jr.'s total adjusted offense level at 36. Based on a total adjusted offense level of 36, and a criminal history category of I, the resulting United States Sentencing Commission's Guideline ("Guideline") range was 188 to 235 months.

Prior to the sentencing hearing, Villegas Sr. and Villegas, Jr. filed extensive sentencing position papers, citing a variety of factors in support of a downward departure or adjustment under the Guidelines. Specifically, the Villegases contended that they were entitled to an adjustment or a downward departure based on the following factors: 1) the safety-valve provision; 2) role in the offense; 3) sentencing entrapment; 4) imperfect entrapment and coercion; 5) outrageous government conduct; 6) alienage; 7) aberrant conduct; and 8) acceptance of responsibility. On August 28, 1997, the government filed its position papers regarding the sentencing factors, arguing that the Villegases were not eligible for any reductions in their offense levels.

On September 4, 1997, two court days before the sentencing hearing, the Villegases moved to substitute their appointed attorneys for retained attorneys. However, because the Villegases previously lacked the financial resources to hire counsel, the Court, on September 15, 1997, held an evidentiary hearing to determine whether a third party would be paying for their attorneys' fees and, if so, whether the Villegases understood the potential conflict of interest that would exist in such an arrangement and would voluntarily waive any conflict. *See Quintero v. United States*, 33 F.3d 1133 (9th Cir.1994). Upon conclusion of the evidentiary hearing, the Court found that a conflict of interest did not exist, and granted the Villegases' motion for substitution of counsel. The sentencing hearing was continued to October 27, 1997. The Court ordered that supplemental sentencing position papers, if any, were to be filed by the Villegases no later than October 14, 1997, with the government's response due no later than October 20, 1997. The Villegases filed supplemental briefs on October 14, 1997. The government did not file a supplemental brief.

On October 22, 1997, the Court, in order to make a comprehensive review of the applicable sentencing factors, continued the sentencing hearing to December 8, 1997. However, due to the unavailability of Villegas, Sr's counsel, the sentencing hearing was continued to January 5, 1998. On November 25, 1997, the Court filed its Notice of Intended Findings Regarding Sentencing, which concluded that, with the exception of outrageous government conduct, alienage, and role in the offense, the factual circumstances of the case would support a reduction and downward departure in the Villegases' total Guideline offense level based on the remaining sentencing factors.

At sentencing, the parties indicated that they had reviewed the presentence report and the Court's Notice of Intended Findings. Counsel were then given the opportunity to refute any factual inaccuracies in the presentence report. The Court indicated that no written objections were received with regard to its intended findings. Counsel for the Villegases indicated that the Villegases concurred in the Court's tentative findings. Although no written objections were filed by the government with regard to the Court's tentative findings, the government, for the first time, orally raised several extensive objections to the Court's tentative findings. The Court noted that the government had been in receipt of the Court's tentative findings for over a month and, therefore, should have properly filed written objections, to allow the Villegases a reasonable opportunity to respond.

The Court further noted that while a defendant has an absolute right, under the Fifth Amendment, not to testify at trial,

*United States v. Bagley*, 772 F.2d 482, 494–95 (9th Cir.1985), *cert. denied*, 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986), the government, during the sentencing proceedings, underscored the fact that Villegas, Jr. chose not to testify at trial, and implied that he failed to qualify for specific sentencing reductions because he failed to supply details of his own conduct or to discuss his involvement in the offense. The Court reminded the government that a defendant has a Fifth Amendment right not to testify.

Pursuant to Fed.R.Crim.P. 32(c)(3)(C), the Villegases were allowed to separately address the Court in mitigation of punishment. Villegas, Sr. and Villegas, Jr. each received a sentence of 63 months, and each was advised of his constitutional right to appeal.

As the basis for the sentences imposed, this Court adopts its own statements and remarks with regard to the sentencing factors and adjustments, as stated on the record at the time of sentencing, and adopts its findings as contained in its Notice of Intended Findings Regarding Sentencing.

Based upon an agreement to transport approximately 100 kilograms of cocaine, the United States Probation Office concluded that the base offense level for each defendant was level 36. An offense level of 36 and a criminal history category of I corresponds to a Guideline range of 188 to 235 months. This Court, however, found that the Villegases' total Guideline offense level to be 26; with a criminal history category of I, which corresponds to a Guideline range of 63 to 78 months.

## DISCUSSION

The Villegases contended that they were entitled to an adjustment or downward departure in sentencing based on the following factors:

1. The Safety–Valve Provision;
2. Role in the Offense;
3. Sentencing Entrapment;
4. Imperfect Entrapment and Coercion;
5. Outrageous Government Conduct;
6. Alienage;
7. Aberrant Conduct; and
8. Acceptance of Responsibility.

The government, however, argued that neither defendant was entitled to any reduction in his offense level. Based on the facts and circumstances of this case, this Court finds that the following sentencing options warrant an adjustment or downward departure.

1. Safety Valve;
2. Sentencing Entrapment;
3. Imperfect Entrapment;
4. Aberrant Conduct; and
5. Acceptance of Responsibility.

The following factors, however, will not warrant a reduction in sentence:

1. Role in the Offense;
2. Outrageous Government Conduct; and
3. Alienage.

## I. Grounds Warranting an Adjustment or Departure

### A. The Safety–Valve Provision

Section 5C1.2 of the Guidelines, also known as the "safety-valve" provision, provides that the district court "can—indeed must—depart from the mandatory minimum sentence" if the defendant meets § 5C1.2's five criteria. *United States v. Sherpa*, 110 F.3d 656, 660 (9th Cir.1996). The safety-valve provision allows the sentencing court to disregard the statutory minimum in sentencing first-time nonviolent drug offenders who played a minor role in the offense and who have made a good faith effort to cooperate with the government. *Sherpa*, 110 F.3d at 660. Specifically, the sentencing court must impose a sentence pursuant to the Guidelines without regard to the statutory mandatory minimum if the court finds that the defendant meets the following five factors:

1. The defendant does not have more than one criminal history point, as determined under the sentencing guidelines;

2. The defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or

induce another participant to do so) in connection with the offense;

3. The offense did not result in death or serious bodily injury to another person;

4. The defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

5. Not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all of the information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

U.S.S.G. § 5C1.2.

Furthermore, "[t]he district court ... must provide reasons for agreeing or refusing to apply section 5C1.2 at the time of sentencing." *United States v. Real–Hernandez*, 90 F.3d 356, 360 (9th Cir.1996). Under the plain language of the statute, "any and all information that the defendant possesses concerning the offense must be provided to the Government." *United States v. Thompson*, 81 F.3d 877, 879 (9th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 214, 136 L.Ed.2d 148 (1996). Here, the probation officer concluded that the Villegases met factors one through four. However, it is the government's responsibility to provide information to the Court to determine whether the Villegases have met the fifth factor.

The government contended that neither defendant "truthfully" provided all the information he knew about the offense and, therefore, they were not qualified to an application of the safety-valve provision. At trial, evidence was presented which showed that the Villegases met with an undercover DEA agent and stated that they had transported narcotics for other individuals. Villegas, Jr. stated that both he and Villegas, Sr. had

packed narcotics with legitimate merchandise to conceal the narcotics from law enforcement. Furthermore, at the July 18, 1996, meeting, Villegas, Jr. represented to the undercover agent that he and his father had been involved in the transportation of narcotics in the past. The government, therefore, believed that the Villegases were experienced in trafficking narcotics, and that they possessed additional information regarding past drug trafficking activities which they refused to disclose.

A defendant must disclose "all information" regarding the offense. This information includes "details concerning other parties to the crime, such as the source who provided the defendant with the drugs and other persons in the chain of distribution, *if known*." *United States v. Shrestha*, 86 F.3d 935, 939 (9th Cir.1996)(emphasis added). If the defendant does not possess such information, "he at least should [communicate] that fact to the government in order to qualify for the reduction." *Shrestha*, 86 F.3d at 939 (quoting *United States v. Rodriguez*, 69 F.3d 136, 143 (7th Cir.1995)). The initial burden of proof is on the defendant to demonstrate by a preponderance of the evidence that he is eligible for the reduction. *Shrestha*, 86 F.3d at 940. Once he has made this showing, however, it falls upon the government "to show that the information the defendant has supplied is untrue or incomplete." *Shrestha*, 86 F.3d at 940.

Here, the Villegases have met their burden by timely providing the government with all the information they had concerning the offense. However, apart from merely stating that the statements made by the Villegases to the undercover agent were untrue, the government has not adequately shown that the Villegases' representation of limited involvement is untrue. In *United States v. Miranda–Santiago*, 96 F.3d 517 (1st Cir. 1996), the court, in addressing § 5C1.2, held that "[t]he government cannot assure success simply by saying, 'We don't believe the defendant,' and doing nothing more." *Miranda–Santiago*, 96 F.3d at 529. While it is possible that the Villegases "might" know more than their designated roles suggest, the

government has offered nothing concrete to so indicate.

For instance, in *Rodriguez*, the Seventh Circuit affirmed the district court's determination that the defendant was not eligible for a reduction under the safety-valve provision. After having been arrested at the airport, the defendant was convicted of possessing cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). In holding that the defendant had not fulfilled § 5C1.2's requirement of truthfully providing "all information," the district court emphasized the fact that the government had listed information which was "obviously" within the defendant's knowledge that could have been provided to authorities. Such as, "who paid for the [defendant's] airline ticket, where he had picked up the cocaine, how he was planning to leave the airport, etc." *Rodriguez*, 69 F.3d at 143.

The government did not meet its burden in this case. Although the government contended that the statements made by the Villegases to the undercover agent showed that the Villegases were experienced drug traffickers, their statements must be considered in the context and circumstances in which they were said. First, given the nature of the government's offer, it is not surprising that the Villegases were willing to enter into the transaction. The Villegases were hired by the undercover agent to merely "transport" narcotics from the Los Angeles area to San Francisco. It should be noted, that this was a task which involved a substantial amount of money ($300.00 per kilo, for 92 kilograms—approximately $27,600.00). From the standpoint of other narcotics related crimes, such as transporting narcotics through an airport, or across state or international borders, the government's offer carried with it only minor risks of getting caught. Thus, the relatively minor risks involved in transporting drugs from Los Angeles to San Francisco made the government's offer more enticing. Consequently, as the risks were minimal, and the money substantial, it is not surprising that the Villegases accepted the government's offer.

Secondly, as the testimony of the government agents and the video tape evidence presented at trial indicate, the government controlled most of the aspects of the undercover negotiations. Under the guise of being a Latin American drug lord, the undercover agent, at the July 18, 1996, meeting, determined what was to be done, what needed to be transported, the amount of cocaine to be transported, and its destination. However, early in the negotiations, the Villegases claimed that they had no prior experience in trafficking narcotics. Nevertheless, the undercover agent clearly emphasized to the Villegases that he did not want to deal with novices, and that the Villegases had to be experienced to qualify for the job. Thus, at the encouragement of the undercover agent, the Villegases stated that they did, in fact, possess prior experience.

Absent their uncorroborated statements of prior involvement, however, there is nothing in the record to support a finding that the Villegases were, in fact, experienced drug traffickers. Rather, the record shows that they were unsophisticated and not experienced at transporting drugs. This is the first offense for both Villegas, Sr. and Villegas, Jr. The Villegases lacked the money to buy narcotics to sell. They gave their true names to both the confidential informant and the undercover agent. In addition, they had no idea how much to charge for transporting it. Thus, taking into consideration the context in which their statements were made, it would be unfair to label the Villegases as major drug traffickers, and to sentence them at a substantially higher Guideline range.

In any event, the Villegases have provided the government with all known information concerning the offense. Section (f) of the safety-valve provision has been termed a "tell all you can tell" provision. *Shrestha*, 86 F.3d at 938–39. Both defendants have explained that, following their arrests, they were interviewed by law enforcement officials and denied any *prior* involvement in narcotics trafficking. At the same time, they gave all the information they had to the DEA agents. They stated that they had never been involved in the transportation of narcotics, and further stated that their statements of prior involvement was merely "puffing" at the direction of co-defendant Gutierrez and the

undercover agent. The Villegases have maintained this position both prior to, and throughout, the trial. The fact that they have not changed their story will not deprive them of relief under the safety-valve. *United States v. Ajugwo*, 82 F.3d 925, 929 (9th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997)(if the district court finds that the prior information was complete and truthful, a recantation of information previously given to the government will not necessarily deny a defendant of safety-valve relief); *Shrestha*, 86 F.3d at 939 (a defendant who maintains his innocence through sentencing can, nevertheless, qualify for the safety valve provision). Furthermore, the Villegases gave notice to both the government and the probation office of their availability to provide additional information relevant to the safety-valve provision. The government, however, never sought additional information.

■ The safety-valve clearly provides that the defendant must truthfully provide to the government all of the information and evidence that the defendant has concerning the offense or offenses that were part of the "same course of conduct." U.S.S.G. § 5C1.2. Here, there is no sound evidence to establish that the Villegases were regular participants in an ongoing criminal enterprise. However, even if they were, the government's objection is based on activities which are not part of the same course of conduct as the present offense. While a defendant is required to provide information regarding "the offense" of conviction and all relevant conduct, a defendant is not required to provide information which is not related to the present offense, or about suspected activities. U.S.S.G. § 5C1.2; *United States v. Gambino*, 106 F.3d 1105, 1111 (2d Cir.1997).

Accordingly, the Villegases have met all five parts of the safety-valve test and are entitled to a two point reduction.

**B. Sentencing Entrapment**

■ The Villegases argued that the district court should depart downward on the basis of sentencing entrapment. Sentencing entrapment or "sentence factor manipulation" occurs when "a defendant, although predisposed to commit a minor or lesser offense, is entrapped into committing a greater offense subject to greater punishment." *United States v. Staufer*, 38 F.3d 1103, 1106 (9th Cir.1994). The Ninth Circuit has recognized that government misconduct of an entrapping nature may warrant a downward departure. *United States v. Garza–Juarez*, 992 F.2d 896, 912–13 (9th Cir. 1993), *cert. denied*, 510 U.S. 1058, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). The burden of proof is on the defendant to demonstrate lack of predisposition to engage in the greater offense. *United States v. Naranjo*, 52 F.3d 245, 250 (9th Cir.1995). Further, the sentencing court is required to make specific findings of whether sentencing entrapment had occurred. *Naranjo*, 52 F.3d at 250.

In *Staufer*, the Ninth Circuit held that the Sentencing Commission recognized the "unfairness and arbitrariness" of allowing drug enforcement agents to put unwarranted pressure on defendants in order to increase their sentence without regard to predisposition. *Staufer*, 38 F.3d at 1107. As a result, the Sentencing Commission amended the Guidelines specifically to provide that:

> If in a reverse sting [operation], ... the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted.

Amend. Application Note to § 2D1.1, ¶ 486. As the *Staufer* court concluded, the Sentencing Commission expressly recognizes that law enforcement agents should not be allowed to structure sting operations "in such a way as to maximize the sentences imposed on defendants, and the courts may take into consideration the predisposition and capacity of the defendant to engage in a deal of the magnitude for which he or she was convicted." *Staufer*, 38 F.3d at 1107.

As Judge Ideman pointed out, ...

Drug agents can decide, apparently without any supervision by anybody to negotiate with somebody for an ounce, a pound, a kilo, 100 kilos, a million kilos of a substance and, of course, if the defendant bites at the bait, then that amount chosen by the drug agent will determine his drug sentence.

*Staufer,* 38 F.3d at 1107–8.

Here, as in *Staufer,* the same sentencing entrapment concerns are present. Although the record is clear that the Villegases were not entrapped, but were willing participants, the evidence does not show that the Villegases were predisposed to transport the *amount* of cocaine involved in this case. Even if viewed in a light most favorable to the government, that the Villegases stated that they had experience in transporting 5 to 10 kilogram quantities of cocaine, the evidence does not establish that the Villegases were predisposed to engage in a deal involving close to "92 kilograms" of cocaine. This amount is far greater than the 5 to 10 kilograms the Villegases "claimed" they had transported in the past.

Furthermore, it was the undercover agent who took the lead in the negotiations. Posing as a big time Latin American drug lord, the undercover agent emphasized the fact that he dealt only in *large* quantities, "one hundred [100], two hundred [200], even five hundred [500] or more." Transcript, July 18, 1996. He stated that he had a buyer requesting "100 kilograms" of cocaine, and that he was not willing to deal with novices. The undercover agent controlled most of the aspects of the negotiations. He determined what was to be done, the amount of cocaine to be transported, when it was to be transported and to where it was going to be transported. To some extent, even the price was manipulated by the government, as it is reasonable to assume that for a substantial amount of cocaine, an equally substantial amount of money would be involved. Thus, leaving the Villegases to easily accept and undertake a relatively simple task for an extraordinarily high fee. As the Ninth Circuit has recognized, this misconduct on behalf of the government is tantamount to sentencing entrapment and would warrant a downward departure in sentencing. *Garza–Juarez,* 992 F.2d at 912–13.

Furthermore, the Guideline range over-represents the amount of cocaine involved in this case. Section 2D1.1(c) of the Guidelines increases the term of imprisonment based on the amount of cocaine involved. The Villegases were convicted of attempting to possess 92 kilograms of cocaine, which is the amount the government represents was involved in this case. According to the Drug Quantity Table in § 2D1.1, 92 kilograms of cocaine would result in a base offense level of 36. The Guideline sentencing range for an offense level of 36 and a criminal history category of I is 188 to 235 months. The facts of this case, however, fail to justify a Guideline range of this magnitude based on the government's mere representation that "92 kilograms" were involved.

█ Facts which enhance a sentence must be proven by a preponderance of the evidence. *See United States v. Restrepo,* 946 F.2d 654 (9th Cir.1991)(*en banc*), *cert. denied,* 503 U.S. 961, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992). At trial, the government did not produce a chemist or expert witness to testify as to the weight of the cocaine or its purity. There was no lab report, nor did the government offer to stipulate to this fact with the defendants. The only evidence as to the quantity of the cocaine involved was through the representations of the undercover agent. However, there was no evidence that he actually weighed what he claimed to be cocaine or that there was even an ounce of cocaine actually in the package. The agent merely produced a bulky package of some sort and represented to the Villegases that it contained 92 kilograms of cocaine. The eagerness of the government to get the Villegases to agree to transport this package strongly suggest that the 92 kilograms is without any evidentiary support. This "unfairness and arbitrariness" on the part of the government to increase the Villegases' sentences is exactly the type of conduct which the Sentencing Commission has warned against. Amend. Application Note to § 2D1.1, ¶ 486; *see also Staufer,* 38 F.3d at 1107. Drug enforcement agents can decide, apparently, without any supervision, to nego-

tiate for any quantity of drugs. In this way, they are able to manipulate sentences by the amount and price of the drugs used in their operations.

In this case, the undercover agent placed unwarranted pressure on the Villegases to transport a considerably large amount of cocaine. As in *Staufer*, the Villegases merely took "the bait." *See Staufer*, 38 F.3d at 1107–8. The evidence, however, does not show that the Villegases were predisposed to engage in a transaction involving 92 kilograms of cocaine. On this basis, sentencing entrapment can legally be relied on to depart under the Guidelines. Because the Villegases have met the criteria set forth in subdivisions one through five of § 5C1.2, and because their offense level is greater than level 26, the Guidelines provide for a two point reduction. U.S.S.G. § 2D1.1(b)(4).

### C. Imperfect Entrapment and Coercion

■ The Guidelines provide for a downward departure in cases of "imperfect entrapment." *Garza–Juarez*, 992 F.2d at 912. Section 5K2.12 of the Guidelines states, in part:

> If the defendant committed the offense because of serious coercion, blackmail, or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence below the applicable guideline range. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be.

The Ninth Circuit has held that "aggressive encouragement" of wrongdoing by a federal agent by initially proposing illegal activity and persistently contacting a defendant by telephone, and in person, over several months until the scheme was completed, although not amounting to a complete defense, may be used as a basis for a downward departure. *Garza–Juarez*, 992 F.2d at 912. Thus, a downward departure under § 5K2.12 is appropriate if a defendant committed the offense due to serious coercion, blackmail, or duress under circumstances not amounting to a complete defense of entrapment.

In the instant case, the government's conduct, although not rising to the level of entrapment, is sufficient to constitute "aggressive encouragement" to support a finding of imperfect entrapment. *See United States v. McClelland*, 72 F.3d 717, 725 (9th Cir.1995), cert. denied, 517 U.S. 1148, 116 S.Ct. 1448, 134 L.Ed.2d 567 (1996). Here, it was the government who first proposed the illegal activity. The government initiated contact through the confidential informant and through Gutierrez. Eventually, this coercion was also applied through the undercover agent, posing as a Latin American drug lord.

In addition, Gutierrez was to be paid five percent of the Villegases' fee by the undercover agent for his introduction and services. The undercover agent also agreed to pay Gutierrez an extra five percent for his efforts in introducing the Villegases. The undercover agent informed Gutierrez that he needed to transport approximately 100 kilograms of cocaine. Gutierrez, then pursued the Villegases for the job. He eventually introduced the Villegases to the confidential informant, who introduced them to the undercover agent, who then attempted to persuade them to transport cocaine to San Francisco. This was done by offering the Villegases the sum of $300.00 per kilo for a supposed 92 kilograms of cocaine; a considerable sum. Accordingly, it was through the concerted enticements of Gutierrez and the confidential informant, as suggested by the undercover agent, that the Villegases became involved in the illegal scheme to transport narcotics. Although the Ninth Circuit does not recognize the theory of "derivative entrapment," based on the factual circumstances of this case, the government's conduct was sufficiently coercive to warrant a downward departure under § 5K2.12. *United States v. Bonanno*, 852 F.2d 434, 439 (9th Cir.1988), cert. denied, 488 U.S. 1016, 109 S.Ct. 812, 102 L.Ed.2d 801 (1989).

Furthermore, the Ninth Circuit has recognized that "a downward departure may be appropriate when government agents use **persuasion alone**, not threats." *Garza–Juarez*, 992 F.2d at 912 (emphasis added). At

trial, the evidence showed that the confidential informant pursued the Villegases for weeks before he was able to place the Villegases in contact with the undercover agent. Both Villegas, Sr. and the confidential informant, himself, testified that following their initial meeting, the confidential informant repeatedly contacted Villegas, Sr. by telephone. While it took the confidential informant only a few days to put Gutierrez in contact with the undercover agent, it took the confidential informant approximately a month to put the Villegases in contact with the undercover agent.

Finally, the undercover agent testified that he had told Villegas, Sr. that Villegas, Jr. had to help him, since Villegas, Sr. was not a truck driver. This sort of aggressive encouragement, although not amounting to a complete defense, is sufficient to warrant a finding of imperfect entrapment. *Garza–Juarez*, 992 F.2d at 912. Accordingly, a two point downward departure is appropriate.

### D. Aberrant Behavior

■■■ The district court may depart downward in sentencing based on "aberrant behavior." *United States v. Takai*, 941 F.2d 738, 742–44 (9th Cir.1991). Aberrant behavior is a mitigating circumstance of a kind or to a degree that the Sentencing Commission did not adequately take into account when formulating the Guidelines. *Takai*, 941 F.2d at 743; U.S.S.G. Ch.1, Pt. A, Intro. (4)(d). The Ninth Circuit has held that there is an "aberrant behavior spectrum" in determining when a departure for aberrant behavior should apply. *Takai*, 941 F.2d at 743. Courts may consider a "convergence of factors" and should take into account the "totality of circumstances" when considering where a defendant's behavior falls along the spectrum and whether to grant a downward departure. *United States v. Fairless*, 975 F.2d 664, 667–68 (9th Cir.1992). While the Ninth Circuit has not required that the defendant's behavior be a single spontaneous or thoughtless act involving no planning, it has "to some extent relied on the concept of 'singularity or spontaneity.'" *United States v. Pierson*, 121 F.3d 560, 564 (9th Cir.1997)(quoting *United States v. Green*, 105 F.3d 1321, 1323 (9th Cir.1997)).

■■■ The Villegases' offense constitutes a single criminal act. The evidence does not clearly establish that the Villegases were involved in an ongoing criminal enterprise. Again, although the government believes that the Villegases' statements to the undercover agent indicate that the Villegases were experienced drug traffickers, these statements must be viewed in the context in which they were made, as well as the nature and terms of the negotiated transaction. Indeed, this case is unusual, as the government offered a substantial sum of money for the Villegases to perform a relatively simple undertaking. The Villegases' statements, therefore, can be viewed as mere bolstering in an attempt to take advantage of the government's offer. In absence of these statements, however, there is no clear evidence that the Villegases were, or had been, regular participants in an ongoing criminal enterprise. "A single episode of criminal conduct, normally a single crime, is another sign that an aberrant behavior departure may be warranted." *United States v. Colace*, 126 F.3d 1229, 1232 (9th Cir.1997)

In addition, the actual act of delivering the narcotics lacked any extensive planning or reflection. On August 5, 1996, after the Villegases accepted the government's offer to transport the narcotics, the undercover agent directed the Villegases to meet, in *two days*, to load the narcotics onto their truck. In fact, from July 18, 1996, the day the Villegases were first introduced to the undercover agent, until August 7, 1996, the day the cocaine was scheduled to be transported, a period of only 20 days had elapsed. Consequently, the Villegases' participation in the drug trafficking scheme was limited, and did not require substantial planning. *See Pierson*, 121 F.3d at 564 (no aberrant behavior departure when "criminal conduct reached a significant level of regularity" and covered a considerable period of time); *See also Green*, 105 F.3d at 1323 (district court abused its discretion by granting a downward departure for aberrant behavior where the defendant was involved for at least a "few months" in a

significant, well planned, marijuana operation).

Moreover, prior to the instant arrest and conviction, both Villegas, Sr. and Villegas, Jr. had no criminal convictions and had never been arrested for any crimes. Although the lack of a criminal history is a factor that has already been considered by the Guidelines, it is a factor to be taken into consideration in determining the "combination of factors" that lead to a downward departure. *Fairless*, 975 F.2d at 668–69. Accordingly, the Supreme Court has adopted this approach and has held that "the district court must make a refined assessment of the *many facts* bearing on the outcome." *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 2046, 135 L.Ed.2d 392, 413 (1996)(emphasis added). Thus, given the "totality of circumstances," a one point reduction for aberrant behavior is warranted.

A one point reduction adequately reflects the seriousness of the offense. Neither defendant has been previously convicted of any crime. Further, given the nature and unusual circumstances of the offense, namely, the government's conduct during the undercover negotiations, a one point reduction would sufficiently reflect the mitigating circumstances in this case. Finally, due to the lack of sophistication, the lack of evidence, and the age of Villegas, Sr., in particular, it is not likely that the defendants will be engaged in any similar conduct of this nature in the future. As these factors are consistent with the sentencing factors enumerated in 18 U.S.C. § 3553, this Court finds that a one point reduction is, therefore, appropriate.

### E. Acceptance of Responsibility

Pursuant to § 3E1.1 of the Guidelines, the Villegases' offense level may be decreased if they clearly demonstrated an acceptance of responsibility for the offense. Section 3E1.1, Application Note No.2, however, states, in part:

This adjustment is not intended to apply to a defendant who puts the Government to its burden of proof at trial by denying essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. A conviction by trial, however, does not automatically preclude the defendant from consideration for such a reduction. In rare instances, the defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.

Under the Guidelines, therefore, courts rarely should grant a reduction for acceptance of responsibility where the defendants have put the government to its burden of proof at trial. U.S.S.G. § 3E1.1, comment. (n.2). Nevertheless, a "[c]onviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction." U.S.S.G. § 3E1.1, comment. (n.2). Because the Villegases went to trial on a defense of coercion and entrapment, they would not automatically be precluded from receiving a reduction for acceptance of responsibility. U.S.S.G. § 3E1.1, comment. (n.2).

Section 3E1.1(b) provides, in part, that a defendant is entitled to a three point reduction if the offense level is 16 or greater and the defendant has assisted the government by taking "one or more" of the following steps:

1. Timely providing complete information to the government concerning his own involvement in the offense; or

2. Timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently.

U.S.S.G. § 3E1.1(b).

The Villegases qualify for a three point reduction under the first prong of § 3E1.1(b), as they had timely provided information to the government concerning their involvement in the offense. Both the government and the probation officer asserted that a reduction for acceptance of responsibility was not warranted due to the statements made by the Villegases to the undercover agents. As explained earlier, these statements amount to mere "puffing" by the Villegases in order to take advantage of the government's rather lucrative offer.

Moreover, the record shows that Villegas, Jr. was arrested on August 7, 1996; Villegas, Sr. voluntarily surrendered the next day. Following the Villegases' arrest and their initial proffers, they were released only after agreeing to cooperate with law enforcement officials. On December 4, 1996, the Villegases were re-arrested, apparently, because they were only able to provide limited information and assistance to their DEA handlers. The record indicates that a period of nearly *four months* elapsed between the date of their arrest and subsequent re-arrest. The indictment was filed on December 13, 1996. The government failed to explain the reason for this substantial lapse in time. Moreover, the government never accounted for, or fully detailed, the Villegases activities or efforts during these four months. The government never specifically indicated which individuals, if any, the Villegases were to gather information about regarding their alleged drug trafficking enterprise.

On the other hand, the Villegases explained that after they were arrested, they both gave all the information they had to the DEA agents, and informed them that they had never been involved in transporting narcotics. They stated that they were uncomfortable when they were solicited to transport the narcotics but that they were enticed to do so by the money offered by the undercover agent. They did, however, agree to help the DEA gather information on "anyone" involved in illegal narcotics activities. The Villegases further explained that, because they were not experienced in trafficking narcotics, they were unable to provide any information to the DEA agents. Nevertheless, following their re-arrest, they again agreed to cooperate. The Villegases, therefore, made their admissions before the government had proven its case at trial, and had cooperated with the government. *See Restrepo,* 930 F.2d at 710; U.S.S.G. § 3E1.1, comment. (n.1(h)) (the timeliness of an admission is relevant to the acceptance of responsibility).

Although the presentence report notes that Villegas, Jr. did not discuss the matter with his probation officer, the Court "may not punish a defendant for failing to partici-pate in fact-gathering at a presentence interview or for not pleading guilty." *United States v. Innie,* 7 F.3d 840, 848 (9th Cir. 1993), *cert. denied,* 511 U.S. 1042, 114 S.Ct. 1567, 128 L.Ed.2d 212 (1994); *see also United States v. Herrera–Figueroa,* 918 F.2d 1430, 1438 (9th Cir.1990). In any event, by making voluntary and truthful admissions at the time of their arrest and re-arrest, and for cooperating with the government, the Villegases have met their burden of demonstrating an acceptance of responsibility under § 3E1.1. Accordingly, the Villegases qualify for a three point reduction for acceptance of responsibility.

## II. Factors Which Fail to Warrant an Adjustment or Downward Departure

### A. Role in the Offense

██ Mitigating role reductions are governed by § 3B1.2 of the Guidelines. Section 3B1.2 states:

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels;

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.

In addition, the commentary to § 3B1.2, Application Note 1, states that:

Subsection (a) applies to a defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are *plainly among the least culpable* of those involved in the conduct of a group. Under this provision, *the defendant's lack of knowledge or understanding of the scope and structure of the enterprise* and of the activities of others is indicative of a role as a minimal participant.

U.S.S.G. § 3B1.2, comment (n.1)(emphasis added).

It was Villegas, Sr.'s contention that, given that the entire offense was manufactured by the DEA agents, he should be entitled to at

least a two-level adjustment as a "minor participant," under § 3B1.2. Villegas, Sr. argued that it was the confidential informant and Gutierrez who initiated contact with him. It was the undercover agent himself who determined what was to be done, what needed to be transported, and how much money was going to be paid. Based on these facts, Villegas, Sr. contended that his participation was only minor at most.

Similarly, Villegas, Jr. took the position that a two point departure is warranted because the original transaction was between Gutierrez and his father. He contended that he was brought into the transaction only *after* all the arrangements had been made, and was merely the driver of the truck. Villegas, Jr., however, was present during the two meetings where the transportation of the cocaine was negotiated and was the person who actually picked up and attempted to transport the cocaine.

The probation officer, therefore, properly assessed the defendants' roles in the offense as essentially equal in culpability. Each defendant played a mutually supportive role, and each defendant's participation was integral to the completion of the offense. Accordingly, a two-level adjustment for role in the offense is not warranted.

### B. Outrageous Government Conduct

Villegas Sr. argued that there were several issues concerning outrageous government conduct which were relevant to sentencing. Outrageous government conduct, however, was the subject of a pretrial motion and, a subsequent motion to reconsider, which were both denied by the Court prior to trial. In addition, at trial, the Villegases, again, attempted to address this claim, but were precluded from doing so by the Court. In any event, "a successful due process defense must be predicated on intolerable government conduct which *goes beyond* that necessary to sustain an entrapment defense." *McClelland*, 72 F.3d at 721 n. 1 (emphasis added). The defendants have not explained how this issue is relevant to a downward departure in sentencing.

### C. Alienage

Villegas Jr. argues that he is entitled to a downward departure in sentencing due to his status as a deportable alien. The Ninth Circuit, in *United States v. Alvarez–Cardenas*, 902 F.2d 734, 737 (9th Cir.1990), held that the threat of deportation was not an appropriate ground for a downward departure from the Guidelines because the defendant's crime was no less serious, nor was his history of past actions changed, because he may be subject to deportation proceedings at some point in time. Recently, however, in *United States v. Cubillos*, 91 F.3d 1342 (9th Cir.1996), the district court departed downward based on what it believed to be increased sentence severity from the defendant's status as a deportable alien. *Cubillos*, 91 F.3d at 1344. The Ninth Circuit, however, vacated the sentence, and remanded for the district court to make a sufficient finding as to the basis of its departure. *Cubillos*, 91 F.3d at 1344. Ten days after the *Cubillos* decision was rendered, the district court in *Santos v. United States*, 940 F.Supp. 275, 281 (D.Hawai'i 1996), held that a defendant's status as a deportable alien, which may result in ineligibility for less restrictive terms of confinement, nevertheless cannot justify a downward departure in sentencing.

Here, Villegas, Jr. claims that he will be deported following his release from imprisonment. As such, he is not eligible to serve the last portion of his sentence in a half-way house and cannot be designated to a minimum security prison. Villegas, Jr., however, has failed to present evidence that he will be denied transfer to a lower security facility, and that if he were denied transfer, the denial would have been due to his deportable alien status rather than for the specific offense he committed. Furthermore, because the Ninth Circuit has shown a reluctance to allow deportability status as a basis for a downward departure, Villegas Jr.'s sentence should not be adjusted based on deportability status.

### CONCLUSION

It was evident from the facts of this case that the government aggressively encouraged the Villegases to enter into its offer to

transport drugs. The evidence did not show that the Villegases were predisposed to engage in an offense involving 92 kilograms of cocaine. Rather, the evidence showed that Villegases were not sophisticated or experienced in trafficking drugs and, therefore, are not likely to engage in a similar offense of this nature in the future.

As the evidence showed, it was through the concerted efforts of Gutierrez, the confidential informant, and the undercover agent that the Villegases became involved in the illegal scheme to transport narcotics. The entire conduct of the government was sufficiently coercive and of an entrapping nature. The fact that the Villegases did not obtain an acquittal on an entrapment defense does not mean that the government's role in inducing them to commit the crime is irrelevant to "the length of the sentence [they] should receive." *United States v. Dickey*, 924 F.2d 836, 839 (9th Cir.), *cert. denied*, 502 U.S. 943, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991).

Therefore, a substantial downward departure from the recommended Guideline offense range of 188 to 235 months is warranted. Accordingly, in consideration of the relevant Guideline factors and adjustments, this Court finds that the Villegases Offense Level Computation is as follows:

| | | |
|---|---|---|
| 1. | Base Offense Level | 36 |
| 2. | Safety-Valve Provision, § 5C1.2 | −2 |
| 3. | Adjustment for Sentencing Entrapment | −2 |
| 4. | Adjustment for Imperfect Entrapment | −2 |
| 5. | Adjustment for Aberrant Behavior | −1 |
| 6. | Acceptance of Responsibility, § 3E1.1 | −3 |
| 7. | **Total Offense Level** | 26 |
| 8. | Criminal History Category | I |
| 9. | Guideline Sentencing Range | 63 to 78 months |